*Decision will be entered under Rule 50.*

MARK BIXBY AND HUDYTHE BIXBY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4085–65, 5104–65, 5105–65, 6221–65—6239–65, 5787–66—5789–66. Filed August 10, 1972.

---

[1] Proceedings of the following petitioners are consolidated herewith: Reva G. Stone, Deceased, Dewey D. Stone, Executor, and Harry K. Stone, Surviving Husband, docket No. 5104–65; Dewey D. Stone and Anne A. Stone, docket No. 5105–65; Philip C. S. Cowan, docket No. 6221–65; Spencer M. Cowan, Jr., docket No. 6222–65; Jack S. Finn and Thelma B. Finn, docket No. 6223–65; Lillian J. Glazer, docket No. 6224–65; Sidney A. Govenar and Rita J. Govenar, docket No. 6225–65; Alfred E. Gutman and Ruth F. Gutman, docket No. 6226–65; Myron I. Jaffe and Katharine W. Jaffe, docket No. 6227–65; Irving Mann and Ruth S. Mann, docket No. 6228–65; Milton E. Robinson and Evelyn W. Robinson, docket No. 6229–65; Alford P. Rudnick and Estate of Charlotte Rudnick, Deceased, Alford P. Rudnick, Administrator, docket No. 6230–65; Celia E. Stone, docket No. 6231–65; David G. Stone and Faye G. Stone, docket No. 6232–65; Hugh D. Stone and Sandra D. Stone, docket No. 6233–65; Judah M. Stone and Carol T. Stone, docket No. 6234–65; Stephen A. Stone and Sybil F. Stone, docket No. 6235–65; Josef E. Teplow and Miriam F. Teplow, docket No. 6236–65; Theodore H. Teplow and Charlotte L. Teplow, docket No. 6237–65; Arthur T. Wasserman and Etta W. Wasserman, docket No. 6238–65; Converse Rubber Corporation, docket No. 6239–65; Converse Rubber Corporation, docket No. 5787–66; Tyer Rubber Corporation, docket No. 5788–66; and Granite State Rubber Company, docket No. 5789–66.

758

*Alford P. Rudnick, Jack H. Calechman, Harold Lavien,* and *Carl E. Axelrod,* for the petitioners.

*Robert B. Dugan* and *William T. Hayes,* for the respondent.

DAWSON, *Judge:* These consolidated cases involve deficiencies in the Federal income tax of each of the individual petitioners for the taxable year 1961, of Converse Rubber Corp. for the taxable years ended December 30, 1961, and December 29, 1962, and of Tyer Rubber Corp. and Granite State Rubber Co. for the taxable year ended December 29, 1962. The deficiencies determined by respondent are as follows:

| Petitioners | Docket No. | Year ended | Deficiency |
|---|---|---|---|
| Mark and Hudythe Bixby | 4085–65 | 1961 | $105,293.68 |
| Reva G. Stone, deceased | 5104–65 | 1961 | 90,392.04 |
| Dewey D. and Anne A. Stone | 5105–65 | 1961 | 91,127.76 |
| Philip C. S. Cowan | 6221–65 | 1961 | 50,386.37 |
| Spencer M. Cowan, Jr | 6222–65 | 1961 | 50,386.37 |
| Jack S. and Thelma B. Finn | 6223–65 | 1961 | 48,943.49 |
| Lillian J. Glazer | 6224–65 | 1961 | 41,240.96 |
| Sidney A. and Rita J. Govenar | 6225–65 | 1961 | 34,347.39 |
| Alfred E. and Ruth F. Gutman | 6226–65 | 1961 | 8,357.66 |
| Myron I. and Katharine W. Jaffe | 6227–65 | 1961 | 32,889.12 |
| Irving and Ruth S. Mann | 6228–65 | 1961 | 119,176.14 |
| Milton E. and Evelyn W. Robinson | 6229–65 | 1961 | 33,835.12 |
| Alford P. Rudnick and Estate of Charlotte Rudnick, deceased | 6230–65 | 1961 | 50,179.89 |
| Celia E. Stone | 6231–65 | 1961 | 1,959.06 |
| David G. and Faye G. Stone | 6232–65 | 1961 | 122,254.62 |
| Hugh D. and Sandra D. Stone | 6233–65 | 1961 | 110,586.78 |
| Judah M. and Carol T. Stone | 6234–65 | 1961 | 46,007.25 |
| Stephen A. and Sybil F. Stone | 6235–65 | 1961 | 134,578.10 |
| Josef E. and Miriam F. Teplow | 6236–65 | 1961 | 30,102.59 |
| Theodore H. and Charlotte L. Teplow | 6237–65 | 1961 | 32,302.25 |
| Arthur T. and Etta W. Wasserman | 6238–65 | 1961 | 37,410.00 |
| Converse Rubber Corp | 6239–65 | 12/30/61 | 691,699.15 |
| Converse Rubber Corp | 5787–66 | 12/29/62 | 80,612.64 |
| Tyer Rubber Corp | 5788–66 | 12/29/62 | 16,556.69 |
| Granite State Rubber Co | 5789–66 | 12/29/62 | 23,825.23 |

Additions to tax under section 6653(a), I.R.C. 1954, were determined by respondent against the following petitioners:

| Petitioners | Docket No. | Year ended | Amount |
|---|---|---|---|
| Reva G. Stone, deceased | 5104–65 | 1961 | $4,519.60 |
| Dewey D. and Anne A. Stone | 5105–65 | 1961 | 4,556.34 |

Numerous issues raised in the pleadings have been settled by the parties and can be given effect in the Rule 50 computations. Two major issues, however, remain to be decided. The first major issue is whether the purchase of the assets of Tyer Rubber Co. by Converse Rubber Corp. from the Stone Family Bermuda Trusts was a real transaction in substance serving legitimate business purposes or a sham. Related to this issue are several subsidiary issues, namely, whether Converse Rubber Corp. is entitled to the cost basis which it claimed with respect to the Tyer Rubber Co. assets; whether Converse Rubber Corp. or its subsidiary, Tyer Rubber Corp., is entitled to a deduction for depreciation based on the above basis; and whether Converse Rubber Corp. is entitled to deductions for interest paid or accrued in connection with two series of debentures issued to the Bermuda trusts. Another related issue is whether the purchase price of the Tyer assets must be reallocated. This issue concerns the value to be given guaranteed accounts receivable. If we decide that the purchase transaction was a sham but the debentures nevertheless had some value, we must also determine whether each of the individual petitioners received a taxable constructive dividend.[2] The second major issue is whether certain individual petitioners who purchased so-called private annuities from the Stone Family Bermuda Trusts are subject to tax on all income received by the trusts.[3] The question of how to tax the annual payments, if they are found to be true annuity payments, is not in issue. A final issue concerns additions to tax under section 6653(a).

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

[2] Each of the individual petitioners, or his or her spouse, is a beneficiary of the N. Louis Stone Trust (U.S.), the sole shareholder of Converse Rubber Corp., except the petitioners in docket No. 6230–65, Alford P. Rudnick and Estate of Charlotte Rudnick, deceased, Alford P. Rudnick, administrator.

We note that Robert S. Friedman, who is a beneficiary of the N. Louis Stone Trust, is not a party to these proceedings.

[3] This issue appears in the following dockets: Reva G. Stone, deceased, Dewey D. Stone, executor, and Harry K. Stone, surviving husband, docket No. 5104–65; Dewey D. Stone and Anne A. Stone, docket No. 5105–65; Irving Mann and Ruth S. Mann, docket No. 6228–65; Alford P. Rudnick, administrator, docket No. 6230–65; David G. Stone and Faye G. Stone, docket No. 6232–65; and Stephen A. Stone and Sybil F. Stone, docket No. 6235–65.

We note that Abraham Stone, one of the nine "annuitants," is not a party hereto.

The individuals named as petitioners are involved in these proceedings either by virtue of the fact that they are beneficiaries of the "simple" trust which is the sole shareholder of Converse Rubber Corp. or because they purchased "private annuities" from certain foreign situs trusts. All of these individuals resided in Massachusetts at the time of filing their petitions with this Court and all filed their Federal income tax returns for the calendar year in question, 1961, with the district director of internal revenue, Boston, Mass.

Tyer Rubber Corp. is an affiliate of Converse Rubber Corp., and its principal office at the time of filing its petition herein was located in Andover, Mass. It filed a separate Federal income tax return in 1962 with the district director of internal revenue, Boston, Mass.

Granite State Rubber Co. is likewise an affiliate of Converse Rubber Corp. Its principal office at the time of filing was Malden, Mass.; and it, too, filed its 1962 return with the district director of internal revenue, Boston, Mass.

Converse Rubber Corp. (herein called Converse) is a family-run Massachusetts corporation which manufactures rubber and canvas footwear. It had its principal office in Malden, Mass., when it filed its petition herein. For its taxable year ended December 30, 1961, Converse filed with the district director of internal revenue, Boston, Mass., a consolidated Federal income tax return including the following affiliated corporations: Converse Rubber Corp., Granite State Rubber Co., Tyer Rubber Corp., Plastiform Footwear, Inc., and Limerick Manufacturing Co. For the taxable year ended December 29, 1962, Converse and its affiliates filed separate returns.

The following persons were officers of Converse throughout calendar years 1960, 1961, and 1962, except as otherwise noted:

| | |
|---|---|
| President _____ | Henry C. Berlin (until his death on Sept. 6, 1961) |
| | Albert H. Wechsler (elected president on Sept. 21, 1961) |
| General Manager _____ | Albert H. Wechsler (until Jan. 23, 1962) |
| | Stephen A. Stone (named general manager on Jan. 23, 1962) |
| Treasurer _____ | Stephen A. Stone |
| Vice president _____ | Albert H. Wechsler (until Sept. 21, 1961) |
| Vice president and assistant treasurer __ | Abraham Stone |
| Vice president and clerk _____ | David G. Stone |
| Vice president _____ | Alford P. Rudnick |
| Vice president _____ | Edward F. Casey |

During the same years the following persons were members of Converse's board of directors: Harry K. Stone, Dewey D. Stone, Abraham Stone, Stephen A. Stone, David G. Stone, Irving Mann, Albert H. Wechsler, Hugh D. Stone, Spencer M. Cowan, Edward F.

Casey, Henry C. Berlin, and Alford P. Rudnick. Henry C. Berlin served as director until his death on Sept. 6, 1966. Alford P. Rudnick was elected to the board on April 30, 1962.

All of the outstanding and issued common stock of Converse during the years in question was held under a trust indenture dated November 27, 1946, and created in the name of N. Louis Stone. The trustees of this "simple" trust were, at the time of its creation, Dewey D. Stone (Louis' brother), Harry K. Stone (Louis' brother), and Stephen A. Stone (Louis' nephew). The trust instrument designates as "life beneficiaries" Reva G. Stone (Harry's wife), Anne A. Stone (Dewey's wife), Celia E. Stone (wife of Joseph Stone, Louis' brother), and James Stone (Louis' brother). It also designates the following persons as "named beneficiaries": Stephen A. Stone (Louis' nephew), David G. Stone (Louis' nephew), Ruth S. Stone (Louis' niece), Robert S. Friedman (Dewey's nephew), Ruth F. Gutman (Dewey's niece), Hudythe Bixby (Louis' niece), Thelma B. Finn (Dewey's niece), Charna Cowan (Louis' niece), Hugh D. Stone (Louis' nephew), Josef Teplow (Louis' nephew), Theodore H. Teplow (Louis' nephew), Carol Teplow (Louis' niece), Lillian J. Shriber (Dewey's niece), Rita J. Govenar (Dewey's niece), Myron Jaffe (Dewey's nephew), Evelyn W. Robinson (Dewey's niece), and Etta W. Wasserman (Dewey's niece).[4]

## The Tyer Purchase

Tyer Rubber Co. (herein called Tyer) was, prior to 1961, wholly unrelated to Converse. It manufactured rubber, canvas, and plastic footwear, rubber and synthetic covered rolls, and molded and extruded rubber industrial specialities. Its principal facilities were located in Andover, Mass.

During the fiscal years 1958, 1959, and 1960, the company's earnings declined in spite of increasing sales. Low-priced imported shoes and problems in its plastic footwear business depressed profit margins. Major stockholders were dissatisfied. Towards the end of 1960, Tyer's stock sold "over the counter" at a price below book value.

In August 1960, Frederick W. Richmond, a business entrepreneur with extensive experience in the acquisition of corporations, entered into purchase negotiations with Wallace Brimer, Tyer's president. Neither Richmond nor Brimer had had prior dealings with Converse, and neither was related to the Stone family or any other officer or di-

---

[4] Since the trust's creation, the following events have occurred: James Stone died prior to Jan. 1, 1961; Reva G. Stone died on Nov. 23, 1961; Charna Cowan died in 1955 and was survived by two sons, Philip Cowan and Spencer Cowan, Jr.; Ruth Stone married Irving Mann; Carol Teplow married Judah Stone; and Lillian Shriber married Samuel Glazer.

rector of Converse. While Brimer was interested and the negotiations progressed smoothly, the parties were concerned that, among other things, the sale occur before February 28, 1961, the end of Tyer's taxable year, in order for the company to be able to take maximum advantage of carryback losses which a sale would generate.[5]

The negotiations resulted in a final agreement dated January 27, 1961, between Tyer and Richmond Rubber Co., Inc., a Massachusetts company organized by Richmond to acquire Tyer's assets. According to the terms of the Tyer-Richmond agreement, the buyer (Richmond Rubber Co., Inc.) promised to pay approximately $1,900,000, subject to certain adjustments and reductions, and to assume liabilities of $1,865,115.[6] The purchase price was based on a formula that was designed to yield each Tyer stockholder $16 per share on liquidation, after taking into consideration Tyer's cash and foreseeable tax refunds. At that time the stock of Tyer was selling for $10 to $11.50 per share. An additional term was a 5-year employment contract for Brimer as president.

After negotiating the above acquisition and reaching a tentative agreement, sometime after November 16, 1960, Richmond began to change his mind. Two other acquisitions which he had been pursuing and which were more within his area of expertise had materialized. He decided as a consequence not to try to run Tyer but instead to try to find another buyer who would. Because of the tentative provision for the employment of Brimer, he preferred a buyer who was interested in operating the business. Soon thereafter, Richmond approached Dewey D. Stone, a director of Converse and a patriarch of the Stone family, and proposed that Converse purchase his rights to acquire Tyer's assets.

Converse immediately recognized the opportunities inherent in Richmond's proposal. The cash price agreed upon by Richmond and Tyer (between $1,800,000 and $1,900,000) plus the price of Richmond's interest in the rights to acquire Tyer's assets (thought to be between $60,000 and $100,000) was substantially below the net book value of the assets. More importantly, Tyer possessed manufacturing facilities which Converse could utilize—for instance, Tyer and Converse's plastic footwear production could be combined; approximately 1,500 accounts, many of which were not accounts of Converse; and an excellent, 100-year-old reputation. Converse estimated that by acquiring Tyer's assets, it could increase its sales volume by approximately $5 million

---

[5] In fact, Tyer Rubber Co.'s successor, Tyer Rubber Corp., applied for Federal tax refunds in the amounts of $69,302.56, $71,701.13, and $100,726.53 for taxable years 1960, 1959, and 1958, respectively. The record does not disclose the amounts actually refunded.

[6] An adjusted cash price of $1,815,177.34 was eventually paid.

and profits by at least $500,000 per year. In short, Converse saw the opportunity of removing from the weakened hands of a competitor approximately $5 million worth of business.

There were drawbacks, however. Converse itself did not have the $1,900,000 to $2 million needed to pay Richmond and purchase the assets. Furthermore, Converse was prohibited from making such a purchase under the provisions of a debenture agreement existing between Converse and Connecticut General Life Insurance Co. (herein called Connecticut General) and First National Bank of Boston (herein called First National). Under that agreement, Connecticut General held $1,320,000 of 5-percent Converse debentures purchased in 1957 and due in 1972.

Confronting these facts, the principals behind Converse, i.e., certain members of the Stone family and others active in the conduct of Converse's affairs and their advisers, decided that with the cooperation of First National they could turn this already attractive opportunity into an even more attractive one. Their plan, in broad outline, was to step up the cost basis of the Tyer assets by interposing certain foreign trusts (herein called the Stone Family Bermuda Trusts or the Bermuda trusts). [7] The Bermuda trusts would be directed, first, to purchase the rights to the assets from Richmond at the proposed bargain price and, second, to resell them to Converse for a greatly increased price. The difference between the bargain price and the increased price would be paid to the third parties in long-term, highly subordinated debt. Then, if the assets proved as productive of additional profits as anticipated, the debt could be repaid. Since the debt would be subordinate to all existing and subsequently incurred indebtedness, the corporation's credit would not be impaired. Also, First National's interests would not be adversely affected.

On January 15, 1961, Stephen A. Stone conferred with William Raye, a vice president of First National and a close business associate of the Stones. Raye was Converse's loan officer at the bank. He also handled the banking affairs of several other corporations, including Cary Maple Sugar Co. and Crosby Valve & Guage Co. that were directed by members of the Stone family. The two men met at Raye's home and discussed the proposed acquisition at length. Before the meeting ended, Raye agreed that the proposed acquisition was a good idea and that his bank should finance it.

Raye subsequently confirmed this arrangement with First National's credit committee and, on January 25, 1961, wrote a formal commitment

---

[7] The Bermuda trusts are described at length in connection with the "private annuities" issue.

letter [8] to Converse encompassing their prior understanding. Converse paid a $30,000 fee for the bank's commitment.

On the next day, Alford P. Rudnick—who was a vice president of Converse and an executive member of all but one of the Bermuda trusts, as well as general counsel of Converse—sent detailed instructions to the Bank of N. T. Butterfield & Son, Ltd., of Bermuda (herein called Butterfield Bank), the trustee of the Bermuda trusts, regarding the purchase by the trusts of Richmond Rubber Co., Inc., and the resale of the company to Converse. Rudnick also sent a member of his law firm, Joshua A. Guberman, to Bermuda to explain any aspects of the transaction which were unclear.

Beyond First National's financing commitment, Converse's plan called for Raye's cooperation in two respects: The above-mentioned prohibition in Converse's debenture agreement with Connecticut General and First National would have to be modified or abolished and some pretense for involving the Bermuda trusts would have to be created. With regard to the debenture agreement, Raye and the Stones thought from the outset that Connecticut General's loan would have to be prepaid. Converse, therefore, would have to borrow from First National enough money to pay off Connecticut General as well as to purchase the Tyer assets. On January 19, 1961, Raye informed Connecticut General that Converse had received the offer from Richmond; that Converse had accepted "subject to sale and a meeting with Tyer management"; and that Converse had talked with Brimer, Tyer's president, and "it looks as if the deal will go through." Raye apparently did not request additional funds from Connecticut Gen-

[8] The letter reads as follows:

"We have considered the financing of your proposed acquisition of the assets of Tyer Rubber Company, and, predicated upon the conditions stated below, we hereby commit ourselves to provide the necessary financing up to a total of $7,000,000 on a basis acceptable to both you and ourselves, irrespective of whether or not Connecticut General will be willing to extend or expand their existing term loan.

"It is our understanding that several trusts of which The Bank of N. T. Butterfield & Son, Limited, is trustee will acquire with their own funds all of the capital stock of Richmond Rubber Company, Inc., the corporation with which Tyer has contracted for the sale of its assets, and that you will purchase Richmond's stock for a price equal to the amount by which the fair value of Tyer's net assets exceeds the price to be paid Tyer pursuant to its agreement with Richmond. The price to Converse for the stock of Richmond will be paid by your issuing your long-term debentures in form satisfactory to us and which in any event will not bear interest and will be fully subordinated to your indebtedness to us arising in connection with this transaction or otherwise.

"In addition, as part of your purchase agreement with the Trustee, you will require the trusts to purchase from Converse, over a period of six months and at face value, $250,000 of your long-term subordinated debentures in all respects identical with your debentures issued for the purchase of Richmond except that they may bear interest, which need not be subordinated, at the rate of 6% per annum.

"Our fee for this commitment to lend is $30,000. Inasmuch as it seems impractical at this point to negotiate a funding of the long-term part of these borrowings, we will provide the necessary financing for the coming year and expect to assist in the funding of the long-term portion of the borrowings at a suitable time, probably around the end of the year."

eral. Instead, he merely asked that it amend the debenture agreement to allow up to $7 million of debt for the next 12 months.

Connecticut General's initial inclination was to somehow "stay in the picture," that is, to modify the existing loan agreement rather than allow prepayment. Raye and Converse accordingly prepared drafts of the necessary amendments. As negotiations continued, however, Connecticut General grew less and less enthusiastic. Finally, it attached conditions to its agreement to allow the acquisition.

But Connecticut General was negotiating in the dark. It was never told about Converse's plan involving the Stone Family Bermuda Trusts and an increase in the cost basis of the Tyer assets. As of February 17, 1961—6 days before the acquisition actually took place and 3 weeks after Rudnick instructed the trustee to carry out the plan— Connecticut General still thought that "The Company [Converse] plans to purchase on February 23 the assets of Tyer Rubber Company. * * * The acquisition will be financed by roughly $2,000,000 of bank borrowing, $500,000 of subordinated debt, and sale of Tyer's nonfootwear lines." After reviewing its information, Connecticut General concluded that "Absent substantiation of earnings potential, and recognizing the past earnings [of Converse and Tyer] and tax gimmicks, this proposal does not appear well margined." It therefore allowed Converse to redeem its debentures at par, waiving a prepayment premium.

With regard to the involvement of the Bermuda trusts, Raye and the Stones agreed that First National would require as a condition precedent to financing the Tyer acquisition (up to $7 million), the infusion of $250,000 of new money in Converse. This "fresh money" would come from the Stone Family Bermuda Trusts in exchange for a series of 6-percent, 10-year debentures that would be fully subordinated to the bank's prior or subsequent loans. On the theory that the interest on these debentures was not sufficient consideration, the Bermuda trusts also would be paid the difference between the price negotiated by Richmond and Tyer ($1,800,000 to $1,900,000 in cash, plus assumption of Tyer's liabilities) and the "fair market value" of the assets. The latter figure, at least with respect to fixed assets, was to be established by an appraisal commissioned by Converse and the trusts.

On January 27, 1961, the same day that the final agreement between Tyer and Richmond was signed, the Butterfield Bank, as trustee of the Bermuda trusts and pursuant to Rudnick's instructions, entered into an agreement to purchase the stock of Richmond Rubber Co., Inc., Richmond's corporation, for the sum of $63,500. It is unclear whether or not the trusts had $63,500 to spend at this point in time. (They ap-

parently held $7,000 of paid-in cash, approximately $43,500 of cash paid on the redemption of certain closely held stock (discussed below), and notes representing a prior dividend on this same stock. The notes had an unascertainable value.)

Also, over the next 6 months, the Butterfield Bank, as trustee, proceeded to purchase 6-percent, 10-year, subordinated debentures from Converse, in the face amount of $250,000. To enable it to purchase these debentures, the Butterfield Bank was directed by Rudnick to borrow, and did so borrow, from another series of Stone Family Bermuda Trusts (not here in issue) of which it was also trustee.

On January 30, 1961, the Butterfield Bank, as trustee, entered into an agreement with Converse to sell to Converse the stock of Richmond Rubber Co., Inc. Under the terms of the agreement, the Bermuda trusts were to receive an amount equal to the fair market value of the Tyer assets, less Tyer's assumed liabilities, less the adjusted cash price to be paid by Richmond Rubber Co., Inc., to Tyer in the exercise of the option to purchase Tyer's assets. The fair market value was to be established by appraisal. The amount eventually paid to the Bermuda trusts by Converse was in the form of 10-year, non-interest-bearing debentures having a face value at issuance of $1,641,526.75 and upon maturity of $2,689,832.72. The face value upon maturity was arrived at by precomputing interest at the rate of 5 percent, compounded semiannually, and adding it to $1,641,526.75. These debentures were unsecured and subordinated to all prior or subsequent indebtedness for money borrowed. They provided, in part:

Anything in this note to the contrary notwithstanding, the indebtedness evidenced hereby shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth, to all indebtedness of the corporation for money borrowed, whether outstanding at the date hereof or incurred thereafter (such indebtedness of the corporation to which this note is subordinate and junior being sometimes hereinafter.referred to as "superior indebtedness") :

1. The corporation will not repay any part of the principal amount of this note while any such superior indebtedness remains unpaid.

2. In the event of any insolvency or bankruptcy proceedings, any receivership, liquidation, reorganization or other similar proceedings * * * then the holders of superior indebtedness shall receive payment in full of all principal and interest on all superior indebtedness before the holder hereof is entitled to receive any payment hereon * * *

In an agreement dated January 31, 1961, Converse guaranteed the performance by Richmond Rubber Co., Inc., of its obligation under the January 27 buy-sell agreement with Tyer.

On February 13, 1961, Converse organized a Massachusetts corporation, Andover Rubber Corp. (herein called Andover), as its wholly owned subsidiary, acquiring 100 shares of Andover for $50 per share.

Shortly thereafter, on February 24, 1961, Converse assigned its

agreement of January 30, 1961, with the Butterfield Bank, as trustee, to Andover and subscribed to an additional 7,400 shares of Andover stock.[9] As of the same date, Converse made a contribution to the capital of Andover by delivering to Andover the above-described 10-year debentures having a face value at issuance of $1,641,526.75.

On February 27, 1961, Richmond Rubber Co., Inc., whose stock was then owned by Andover, acquired the assets of Tyer for an adjusted cash price of $1,815,177.34. Converse paid Richmond Rubber Co., Inc., $1,815,177.34 directly by check and Richmond Rubber Co., Inc., paid the same amount to Tyer. Richmond Rubber Co., Inc., was then liquidated, and Andover thus acquired the assets formerly owned by Tyer. Andover promptly changed its name to Tyer Rubber Corp.

Interest has been currently paid on the 6-percent subordinated debentures of $250,000, but repayment will have to be extended. Neither principal nor interest has been paid by Converse on the 10-year debentures (face value at issuance of $1,641,526.75) and the due date of these notes, February 26, 1971, has been extended for 5 years. As of the date of trial, timely repayment of this second series of debentures was highly unlikely.

### The "Private Annuities"

Prior to the events surrounding the Tyer purchase, the following events transpired.

On June 28, 1960, the seven above-mentioned Stone Family Bermuda Trusts were created for the purpose of selling "private annuities" to nine individuals. Eight of these individuals—all members of the Stone family—are petitioners herein; one, Abraham Stone, is not. The ninth individual petitioner, Alford P. Rudnick, is a close family adviser. N. Louis Stone was named as settlor in six of the trusts,[10] and Albert H. Wechsler, the general manager of Converse, was named as settlor in one.[11] The Butterfield Bank was named as trustee in all seven trust indentures. Each trust was funded with $1,000.

While the provisions detailing the accumulation and distribution of income and naming the beneficiaries differ, the other provisions and the general layout of the seven trusts are the same. The relevant portions of the specimen trust can be summarized as follows:

The trust is established under the law of Bermuda.

The term "the Trust Estate" is defined as meaning any real or per-

---

[9] The entire agreement was assigned except for provisions relating to Converse's obligation to pay the purchase price to the trusts and the trustee's obligation to purchase $250,000 worth of 6-percent subordinated debentures.

[10] The Abraham Stone Family Bermuda Trust, The David G. Stone Family Bermuda Trust, The Dewey D. Stone Family Bermuda Trust, The Harry K. Stone Family Bermuda Trust, The Ruth T. Mann Family Bermuda Trust, and The Stephen A. Stone Family Bermuda Trust.

[11] The Alford P. Rudnick Family Bermuda Trust.

sonal property, including rights of any description, and any sums of money vested in the trustee. "The Settlor" means N. Louis Stone or, in the case of The Alford P. Rudnick Family Bermuda Trust, Albert H. Wechsler.

Article 7, "Additions to Trust Estate," provides that the settlor or any other person may from time to time transfer additional property to the trust.

Article 8 deals with accumulation and distribution of trust income and differs from trust to trust. Under the terms of four of the trusts,[12] the named primary beneficiary (in every case, the spouse of the person for whom the trust is named) is given the right to withdraw in any year up to 10 percent of the value of the trust estate. Any income which is not so withdrawn is to be accumulated and reinvested by the trustee. "Nothing in the foregoing provisions of this Article shall be construed so as to derogate from or abridge any power conferred upon the Trustee * * * to make loans out of the trust estate to any person other than the settlor." In the remaining three trusts there is no withdrawal provision, but the other provisions are identical. None of the trusts provide for the payment of income to the beneficiaries prior to the death of the person for whom the trust is named, with the exception of The Dewey D. Stone Family Bermuda Trust.

Article 12 provides that the settlor or, in the event of his death or disability, the advisory committee shall have the power to remove the trustee.

Article 15 states that the power to appoint a successor trustee lies with the settlor or, in the event of his death or disability, the advisory committee.

Article 17 sets forth the powers of the trustee. Paragraph (4) of article 17 reads as follows:

it is hereby declared that any power conferred upon the Trustee by any provision of this Indenture with respect to the administration and management of the Trust Estate shall not be exercised in such manner as to enable the Settlor or any other person to purchase, exchange, or otherwise deal with or dispose of the principal or income of the Trust Estate for less than an adequate consideration in money or money's worth;

Provided that nothing in the foregoing provisions of this paragraph shall be construed so as to abridge or derogate from any power conferred upon the Trustee to make loans to any person other than the Settlor without regard to interest or security.

In general, the powers of the trustee to deal with the assets of the trust are very broad. Paragraph (6) of article 17 provides, *inter alia*, that the trustee may pay premiums on policies of insurance on the life of

---

[12] The Ruth T. Mann Family Bermuda Trust, The Stephen A. Stone Family Bermuda Trust, The David G. Stone Family Bermuda Trust, and The Alford P. Rudnick Family Bermuda Trust.

any person other than the settlor; "lend money to any person, other than the settlor, at such rate of interest, or interest free, and with such security, or non-secured, as the Trustee may determine * * *"; and deposit any securities with "Voting Trustees." According to article 19, any person can be named as a "Voting Trustee" except the named settlor.

Article 20 provides for the establishment of any advisory committee. The committee, in the case of five of the seven trusts,[13] was composed at all relevant times of four members: Abraham Stone, Alford P. Rudnick, Joshua A. Guberman (a member of Rudnick's law firm), and Avram J. Bennett.[14] Rudnick and Guberman were the two "Executive Members" of the committees; directions sent by either of them were effective as directions sent by the committee as a whole. The settlor or, if the settlor is dead or legally disabled, the primary beneficiary may remove any member of the advisory committee, with or without cause, and fill the vacancy. It is stated, however, that neither the settlor nor any beneficiary can qualify for appointment as a member of the advisory committtee.

Article 21 gives the advisory committee plenary power over the management, investment, and reinvestment of the trust estate, including the power to veto virtually any act of the trustee affecting the trust estate. Paragraph (5) of article 21 states in part as follows:

any power conferred upon the Committee * * * shall not be exercised in such manner, and any direction given in pursuance thereof shall not be of such nature—

(a) as to enable the Settlor or any other person to purchase, exchange or otherwise deal with or dispose of any part of the Trust Estate for less than an adequate consideration in money or money's worth:

Provided that nothing in the foregoing provisions of this sub-paragraph shall be construed so as to abridge or derogate from any power conferred upon the Trustee to make loans to any person other than the Settlor without regard to interest or security * * *

Paragraph (6) of article 21 states that it is the duty of the trustee to carry out the directions of the committee as soon as practicable.

Article 22 provides that "The Trustee shall not incur any liability for any action taken, or omitted to be taken, by it in accordance with any written direction or consent of the Advisory Committee."

The trust is declared to be irrevocable in article 28.

---

[13] The Harry K. Stone Family Bermuda Trust, The Stephen A. Stone Family Bermuda Trust, The Dewey P. Stone Family Bermuda Trust, The David G. Stone Family Bermuda Trust, and The Ruth T. Mann Family Bermuda Trust.

[14] The advisory committee of The Abraham Stone Family Bermuda Trust consisted of Hugh D. Stone, Alford P. Rudnick, Joshua A. Guberman, and Avram J. Bennett. As to The Alford P. Rudnick Family Bermuda Trust, the committee consisted of Abraham Stone, Joshua A. Guberman, Matthew Brown (another member of Rudnick's law firm), and Avram J. Bennett.

In article 30, termination of the trust is provided for in accordance with the first schedule, which varies slightly from trust to trust.

Upon termination, the trustee, under article 31, shall pay over all principal and accumulated income to the "income beneficiaries" named in the first schedule according to the proportions established therein.

In everything they did, the seven Bermuda trusts acted en masse. Alford P. Rudnick, though not a member of the advisory committee of one of the trusts, directed the operations of all of the trusts.

The following chart shows the beneficiaries of each trust and each trust's "share" of a hypothetical "Aggregate Trust Estate":

| Name of trust | Annuitant(s) | "Primary beneficiary" | "Income beneficiary" | Percent of "trust estate" [1] | Percent of "aggregate trust estate" [2] |
|---|---|---|---|---|---|
| The Abraham Stone Family Bermuda Trust [N. Louis Stone, settlor]. | Abraham Stone. | Josef E. Teplow. [3] | Josef E. Teplow ---- 25<br>Theodore H. Teplow. 25<br>Carol Stone ---- 25<br>Hudythe Bixby ---- 12½<br>Thelma Finn ---- 12½ | | |
| The David G. Stone Family Bermuda Trust [N. Louis Stone, settlor]. | David G. Stone. | Faye Stone [4] | The "children and issue" of David G. Stone [5] | 100 | 10 |
| The Dewey D. Stone Family Bermuda Trust [N. Louis Stone, settlor]. | {Dewey D. Stone / Anne A. Stone. | Anne A. Stone [3] | RuthShriber -------- 6<br>Marilyn Shriber ----- 6<br>Robert S. Friedman. 6<br>Hudythe Bixby ----- 5<br>Thelma Finn -------- 5<br>Josef E. Teplow ----- 8<br>Carol Stone -------- 8<br>Lillian J. Shriber ---- 6<br>Rita J. Govenar ---- 5<br>Myron Jaffe -------- 6<br>Evelyn W. Robinson. 8<br>Etta W. Wasserman. 5<br>George T. Nimitz --- 8<br>Theodore R. Teplow. 8<br>Ruth Gordon ------- 5<br>Joel Gordon -------- 5 | | 29 |
| The Harry K. Stone Family Bermuda Trust [N. Louis Stone, settlor]. | {Harry K. Stone / Reva G. Stone. | Reva G. Stone [3] | The grandchildren of Harry K. Stone. [6] | 100 | 29 |
| The Ruth S. Mann Family Bermuda Trust [N. Louis Stone, settlor]. | Ruth S. Mann. | Irving Mann [4] | The "children and issue" of Ruth S. Mann. [7] | 100 | 10 |
| The Stephen A. Stone Family Bermuda Trust [N. Louis Stone, settlor]. | Stephen A. Stone. | Sybil F. Stone [4] | The "children and issue" of Stephen A. Stone. [8] | 100 | 10 |
| The Alford P. Rudnick Family Bermuda Trust [Albert H. Wechsler, settlor]. | Alford P. Rudnick. | Charlotte Rudnick. [4] | The "children and issue" of Alford P. Rudnick. | 100 | 3 |

[1] This is the percentage of the *individual* "trust estate" to which each income beneficiary is entitled upon termination.

[2] This is the percentage of the *aggregate* "trust estate" which the beneficiaries of the individual trust share.

[3] The "primary beneficiary" of this trust does not have a right of withdrawal.

[4] The "primary beneficiary" of this trust does have a right to withdraw up to 10 percent of the value of the individual "trust estate" per year.

[5] Although it is not clear from the schedule of Stone family relationships offered in evidence, it appears that David G. Stone has two children, Jo and James.

[6] It appears that the grandchildren of Harry K. Stone are Stephen, Joshua, Daniel, Linda, Elizabeth, Spencer Cowan, Jr., Philip C. Cowan, and—for the purposes of this trust's provisions—George T. Nimitz.

[7] It appears that the children of Ruth S. Mann are Joseph and Harry.

[8] It appears that the children of Stephen A. Stone are Jeffrey, Deborah, David, and Judith.

Also, on June 28, 1960, the seven individuals in whose names the trusts were created and two other individuals, Reva G. Stone (Harry K. Stone's wife) and Anne A. Stone (Dewey D. Stone's wife), sold a total of 43,500 shares of class B common stock of Coastal Footwear Corp. to the trustee of the Bermuda trusts for the following "annuities" payable annually:

| "Annuitant" | Shares | Trust | "Annuity" |
|---|---|---|---|
| Abraham Stone | 3,500 | Abraham Stone | $3,945 |
| David G. Stone | 4,500 | David G. Stone | 3,930 |
| Dewey D. Stone | 7,500 | Dewey D. Stone | 9,860 |
| Harry K. Stone | 7,500 | Harry K. Stone | 11,050 |
| Ruth S. Mann | 4,500 | Ruth S. Mann | 3,410 |
| Stephen A. Stone | 4,500 | Stephen A. Stone | 4,060 |
| Alford P. Rudnick | 1,500 | Alford P. Rudnick | 1,735 |
| Reva G. Stone | 5,000 | Harry K. Stone | 5,020 |
| Anne A. Stone | 5,000 | Dewey D. Stone | 6,285 |

The "annuity" agreements provide as follows:

THE BANK OF N. T. BUTTERFIELD & SON, LIMITED of Hamilton, The Islands of Bermuda (hereinafter called "Butterfield"), as it is Trustee of THE _____ FAMILY BERMUDA TRUST under an Indenture of Trust dated June 28th, 1960, and not in its individual capacity or for its own account, acknowledges receipt from_____ of_____, Massachusetts, The United States of America (hereinafter called "the Annuitant") of_____ shares of Class B Common Stock of COASTAL FOOTWEAR CORPORATION, a corporation organized and existing under the laws of Puerto Rico, and in consideration thereof Butterfield, as such Trustee only, hereby agrees to pay to said Annuitant an annuity in the amount and subject to the terms and conditions stated below:

1. The annuity shall be in the sum of_____Dollars payable on July 1, 1961, if the Annuitant is then living, and annually thereafter on the first day of July as long as the Annuitant lives.

2. No part of the consideration paid for this annuity shall be refunded at any time.

3. The annuity payments hereunder may be assigned by the Annuitant or any person subsequently entitled thereto, but Butterfield shall not be under any duty to honor any assignment of annuity payments unless it is in writing and a duplicate original thereof shall have been filed with it. Butterfield shall have no responsibility for the validity or sufficiency of any assignment and shall be fully protected in making annuity payments as specified in such assignment.

4. Butterfield's sole obligation hereunder shall be to make the annuity payments out of the income and principal of The_____Family Bermuda Trust to the extent that they are sufficient therefor and by executing and delivering this Annuity Agreement, Butterfield does not warrant or represent that the income and principal of The_____Family Bermuda Trust will be sufficient to make the annuity payments required to be made hereunder.

Coastal Footwear Corp. (herein called Coastal) is a Puerto Rican corporation, organized in 1953, that is controlled and almost entirely

owned by the Stone family. During the years 1960 and 1961 its class A common stock was held by the following persons:

| Shareholder | Number of shares |
|---|---|
| Harry K. Stone | 16, 666 |
| Dewey D. Stone | 16, 667 |
| Stephen A. Stone | 6, 667 |
| David G. Stone | 5, 000 |
| Ruth S. Mann | 5, 000 |
| | 50,000 |

The class B common stock of Coastal, prior to the "annuity" transactions, was held by the following persons:

| Shareholder | Number of shares | Shareholder | Number of shares |
|---|---|---|---|
| Stephen A. Stone | 4, 500 | Reva G. Stone | 5, 250 |
| Ruth S. Mann | 4, 500 | Abraham Stone | 3, 500 |
| David G. Stone | 4, 500 | Alford P. Rudnick | 1, 500 |
| Dewey D. Stone | 7, 500 | Maurice Nagle | 1, 000 |
| Anne A. Stone | 5, 250 | | |
| Harry K. Stone | 7, 500 | | 45, 000 |

(The 1,500 shares of class B common stock which presumably remained in the hands of Anne A. Stone (250), Reva G. Stone (250), and Maurice Nagle (1,000) are not traced in the record.) As of June 6, 1960, Coastal had accumulated earnings and profits in excess of $900,000.

On July 5, 1960, subsequent to the "annuity" transactions, Coastal paid a dividend of $20 per share on its class B common stock. The dividend was paid by a series of 10-year, 4-percent notes of Coastal. The notes were drawn with Coastal as maker, and the seven Bermuda trusts, the holders of the class B common stock, as payee.

Then, on December 13, 1960, Coastal redeemed all of its class B common stock at $2 per share. One-half the redemption price was paid on December 13, 1960, and the balance was paid on July 14, 1961.

During 1961, the year in issue, the Bermuda trusts received the following payments:

| Trust | Payments from: | | | | Totals |
|---|---|---|---|---|---|
| | Coastal | | | Converse | |
| | Interest on 4% notes | Stock redemption | Note redemption | Interest on debentures | |
| The Abraham Stone Family Bermuda Trust | $1, 988 | $3, 491. 25 | $3, 753. 09 | $416. 86 | $9, 649. 20 |
| The David G. Stone Family Bermuda Trust | 2, 556 | 4, 488. 75 | 4, 825. 41 | 537. 08 | 12, 407. 24 |
| The Dewey D. Stone Family Bermuda Trust | 7, 242 | 12, 718. 12 | 13, 671. 98 | 1, 521. 45 | 35, 153. 55 |
| The Harry K. Stone Family Bermuda Trust | 7, 242 | 12, 718. 12 | 13, 671. 98 | 1, 521. 45 | 35, 153. 55 |
| The Ruth S. Mann Family Bermuda Trust | 2, 556 | 4, 488. 75 | 4, 825. 41 | 537. 08 | 12, 407. 24 |
| The Stephen A. Stone Family Bermuda Trust | 2, 556 | 4, 488. 75 | 4, 825. 41 | 537. 08 | 12, 407. 24 |
| The Alford P. Rudnick Family Bermuda Trust | 852 | 1, 496. 25 | 1, 608. 47 | 179. 02 | 4, 135. 74 |
| | | | | | 121, 313. 76 |

The individual "annuitants" reported the annuity payments that they received from the Bermuda trusts in accordance with the following formula:

Annual annuity payment × $\frac{\text{"investment in the contract"}}{\text{"expected return"}}$ = amount excluded from gross income as a return of capital (until basis in transferred property is recovered);

annual annuity payment—amount excluded=amount taxed as ordinary income under section 72.

The "annuitants" computed their "investment in the contract" by attaching a fair market value of $20 per share to the stock transferred. Thus, the total fair market value of the stock transferred equaled the accumulated earnings and profits of Coastal, $900,000. The "expected return" is the product of the annual payment multiplied by the transferor's life expectancy.

The annual payments made to the eight individual petitioners by the Bermuda trusts were not annuity payments. Furthermore, the petitioners were in fact the real settlors of the trusts. N. Louis Stone and Albert H. Wechsler were only nominal settlors.

Respondent determined that the individual petitioners "actually and/or constructively" realized additional income in the taxable year 1961 (all are calendar year taxpayers) in the following amounts:

| Taxpayer | Docket No. | Amount |
| --- | --- | --- |
| Reva G. Stone, deceased | 5104–65 | $35,908.30 |
| Dewey D. and Anne A. Stone | 5105–65 | 35,926.44 |
| Irving and Ruth S. Mann | 6228–65 | 12,442.72 |
| Alford P. and Estate of Charlotte Rudnick | 6230–65 | 4,172.50 |
| David G. and Faye G. Stone | 6232–65 | 12,502.18 |
| Stephen A. and Sybil F. Stone | 6235–65 | 12,529.39 |

A portion of the amount taxable to each petitioner in 1961 was characterized as interest on the 4-percent Coastal notes; a portion as income upon redemption of some of the 4-percent Coastal notes; a portion as income upon redemption of the class B Coastal stock; and a portion as interest paid on loans by the trusts to Converse in connection with the Tyer purchase transaction.

OPINION

1. *The Tyer Purchase*

A synopsis of the pertinent facts will aid in placing matters relating to the Tyer purchase in proper perspective. In late 1960, Converse, which was controlled by the Stone family, was presented with an extremely attractive opportunity—the chance to purchase an option to buy the assets of Tyer at a price substantially below net book value. Tyer was a competitor and its assets could be easily integrated into Converse's operations. Converse estimated that by purchasing Tyer's

assets it could increase sales by approximately $5 million and profits by approximately $500,000 per year. Instead of purchasing the option directly, however, Converse acquired the option at a greatly increased price in a transaction involving certain previously existing Bermuda trusts which were within its control. The Bermuda trusts purchased the option to purchase Tyer's assets for $63,500, only part of which came from the trusts' own funds. In addition, the trusts borrowed an amount in excess of $250,000 from another group of foreign trusts in order to loan $250,000 to Converse in return for $250,000 worth of 6-percent, 10-year, subordinated debentures. The Bermuda trusts immediately resold the option to Converse in return for $1,600,00 worth of 10-year, highly subordinated debentures. Interest on these debentures was deferred. Converse then exercised the option, sending a check for $1,800,000 to Tyer in exchange for the assets.

Converse included the face value at issuance of the non-interest-bearing debentures in its cost basis for the assets, thereby increasing the cost basis by $1,600,000. It used this increased figure for the purpose of computing depreciation. It also claimed an interest deduction for both the annual amortization of the deferred interest accrued on the $1,600,000 debentures and the annual interest paid on the $250,000 debentures. The respondent's determination disregarded the $1,600,000 increase in the cost basis of the assets in computing depreciation and disallowed the interest deductions.

Respondent's view of these facts can be succinctly stated: Converse paid $3,400,000, not including assumed liabilities, in a contrived transaction for assets having a fair market value at the time of purchase of not more than $1,800,000, again not including assumed liabilities. Thus it artificially stepped up the cost basis of those assets. This result was achieved by interposing controlled third parties, the Stone Family Bermuda Trusts, and paying them $1,600,000 in debentures which were so subordinated as to be, in effect, illusory.

Underlying respondent's view of the facts and his legal arguments is the assertion that the petitioners—more precisely, certain members of the Stone family and their advisers who were active in the management of Converse's business—planned and proceeded to execute an elaborate tax-avoidance plan from the time that they first became aware of the opportunity to buy Tyer's assets at a bargain price.

Respondent makes three closely related arguments with respect to these facts. First, Converse cannot obtain a stepped-up basis as the result of a sham transaction lacking any business purpose. Second, Converse's cost basis for the Tyer assets, under these circumstances, should be based on the fair market value of those assets. For the purpose of establishing fair market value, the price paid by Converse to the Bermuda trusts must be disregarded, leaving the price agreed to

by Tyer and Richmond as the best indicator. Third, Converse cannot add to its cost basis for the Tyer assets any amount of the debenture notes which it issued in connection with the purchase transaction because those notes were so contingent and so subordinated as to be incapable of valuation at the time of their issuance.[15]

Petitioners' view of the facts is very different. They assert that the Bermuda trusts acted as free agents in purchasing the option and reselling it to Converse. Converse was, they say, unable to purchase the assets directly because it alone did not have the necessary funds, and because one of its creditors, Connecticut General, was unwilling to acquiesce in the transaction and its other creditor, First National, insisted that Converse obtain $250,000 in additional capital. As a result, Converse was forced to borrow the $250,000 from the Bermuda trusts. And in order to induce the trusts to act as its lender, Converse had to give up in return (a) $250,000 worth of 6-percent, 10-year debentures and (b) the difference between the purchase price of the assets, $1,800,000, and the true value of the assets, $3,400,000, in the form of $1,600,000 worth of 10-year debentures.

Petitioners' legal arguments run as follows: The transaction which brought Tyer's assets to Converse was in substance, as well as in form, a purchase from the Bermuda trusts.[16] The price paid was arrived at in an arm's-length transaction between Converse and the advisory committee of the trusts and reflected the assets' true fair market value. *Glasgow Village Development Corporation*, 36 T.C. 691 (1961). The fact that the Bermuda trusts acted pursuant to a prior understanding with Converse is irrelevant. *Brown* v. *Commissioner*, 180 F.2d 926 (C.A. 3, 1950), certiorari denied 340 U.S. 814 (1950). Both series of debentures are valid obligations of Converse and, therefore, must be included in Converse's cost basis for the acquired assets. *United Control Corporation*, 38 T.C. 957 (1962).

At the outset, we will comment on several procedural points. First, the respondent's allegation requires us not only to find the surface facts but also to probe the reality of those facts. See *Weyl-Zuckerman &*

---

[15] Respondent makes an additional "constructive dividend" argument. If we find that the transaction was a sham and that the second series of debentures had some value on the date of issuance, then the individual petitioners should be deemed to have received a taxable dividend. He argues:

"Since there is no basis for the corporation making a gratis distribution to the Bermuda Trusts, it must be assumed that the distribution was to the shareholder of Converse, the N. Louis Stone Trust (U.S.). Since said trust is a simple trust its income being distributable annually, the beneficiaries are deemed to have received the distribution and in turn made a gift to the Bermuda Trusts."

We assume that the income-realization doctrine of *Helvering* v. *Horst,* 311 U.S. 112 (1940), plays a part in this argument. Because we find that the second series of notes had no ascertainable value at the time of issuance, we do not reach this question.

[16] Petitioners cite *A. F. Lowes Lumber Co.*, T. C. Memo. 1960–141, and *Ransom W. Chase*, T. C. Memo. 1965–202, as analogous cases.

*Co.*, 23 T.C. 841, 847 (1955), affirmed per curiam 232 F.2d 214 (C.A. 9, 1956). Also, the fact that related or commonly controlled parties are involved herein necessitates our close scrutiny. *Investors Diversified Services, Inc.*, 39 T.C. 294, 306 (1962), affd. 325 F.2d 341 (C.A. 8, 1963). On the other hand, while the petitioners bear the burden of proof herein, their burden cannot be made more onerous by virtue of the character of respondent's allegation. The phrase "sham transaction" is not magical.

As a general rule, the basis of property under section 1012 of the Internal Revenue Code of 1954 is its "cost," [17] and its "cost" in an arm's length, money-for-property transaction is equal to the price paid.[18] *Edward W. Edwards*, 19 T.C. 275 (1952), acq. 1953-1 C.B. 4. This rule, however, does not apply where a transaction is not conducted at arm's-length by two economically self-interested parties or where a transaction is based upon "peculiar circumstances" which influence the purchaser to agree to a price in excess of the property's fair market value. *Investors Diversified Services, Inc.* v. *Commissioner, supra* at 349; *Majestic Securities Corp.* v. *Commissioner*, 120 F.2d 12 (C.A. 8, 1941), affirming 42 B.T.A. 698 (1940). For example, in *Mountain Wholesale Co.*, 17 T.C. 870 (1951), this Court held that where the common shareholders of New Company, which had business income, caused it to purchase at face value the delinquent accounts receivable of Old Company, which was defunct, in order to salvage a bad debt deduction, New Company's "cost" was the fair market value of the property at the time of acquisition, not the price stated as paid. "[T]he evidence convinces us this transfer was a sham and lacked good faith." 17 T.C. at 875.

The principal question in this first group of issues is whether the "cost" of the Tyer assets includes the amounts paid by Converse to the Bermuda trusts in long-term, highly subordinated debentures. Its resolution depends upon whether the purchase of the assets by Converse from the Stone Family Bermuda Trusts was a real transaction serving legitimate business purposes or a sham. This is a question of fact and must be decided within the unique context of this case. *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950).

Having reviewed the entire record and drawn therefrom those interferences which we think are proper, we are unable to accept the petitioners' version of the facts. Although they have produced a large number of exhibits and several witnesses, they have failed to prove

---

[17] SEC. 1012. BASIS OF PROPERTY—COST.

The basis of property shall be the cost of such property * * *.

All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[18] See 3A Mertens, Law of Federal Income Taxation, sec. 21.10.

by a preponderance of credible, believable evidence that the facts stand for anything other than an elaborate tax-avoidance scheme. We think that the three-cornered transaction involved herein was a sham in the sense that the petitioners' real purpose was to effect a purchase of the option by Converse and the interposing of the Bermuda trusts lacked a valid business purpose. In essence, the entire transaction was simply a purchase of the assets by Converse. The trusts acted as mere conduits through which the assets flowed. The offer to sell the option covering the assets was made to Converse. The offeror, Richmond, never dealt with the Bermuda trusts. It was Converse that arranged for the financing of the transaction through and with the help of its loan officer at First National. The bank did not deal with the trusts. The $1,800,000 in cash which was eventually paid to Tyer came directly from Converse, not the Bermuda trusts. In fact, the trusts did not have enough money to lend to Converse; they were compelled to borrow from a second group of trusts. Mr. Brimer, the president of Tyer, dealt exclusively with Converse. He did not agree to continue working for anyone except Converse. It was Converse that guaranteed the performance by Richmond Rubber Co., Inc., of its obligations, including payment, under the buy-sell agreement with Tyer. It was Converse, not the Bermuda trusts, which had a use for the assets. In short, only Converse had any real contacts with the Bermuda trusts and these were in the form of directives.[19]

Accordingly, we hold that the purported $1,600,000 worth of debentures were not given to the Bermuda trusts in exchange for the option to buy the assets of Tyer and cannot be included in Converse's cost basis for the assets. Converse's cost basis must be limited to the fair market value of the assets as represented by the amount of cash paid in exercising the option, plus the amount of liabilities assumed, plus $63,500, Richmond's price for the option. Cf. *Mountain Wholesale Co., supra.*

Since our own view of the facts is set forth in detail in our Findings of Fact, we need not repeat it. Instead, we will briefly discuss three key factual determinations. *First,* we find that Converse did not seriously attempt to retain Connecticut General as a creditor. This is significant because if Converse had been able to retain Connecticut General as a creditor, it would not have been necessary for Converse to borrow as much cash as it did from First National. Converse still would have needed to borrow enough cash to purchase and then to exercise the option to buy Tyer's assets, but it would not have needed to borrow additional funds to prepay its loan with Connecticut Gen-

---

[19] For another case involving Bermuda trusts acting as conduits in a non-arm's-length, prearranged transaction, see *Egbert J. Miles,* 41 T.C. 165 (1963).

eral. And if Converse had had to borrow less, the alleged $250,000 capital requirement by First National would appear to be less realistic. Also, if the attempt was only halfhearted, the credibility of petitioners' position with regard to the facts would be seriously undermined. The petitioners would have us believe that Converse earnestly tried, with the assistance of its loan officer at First National, to persuade Connecticut General to acquiesce in the proposed transaction and that it was only Connecticut General's reluctance and burdensome conditions which lead to prepayment. But the facts are that Connecticut General was initially interested in the prospect of Converse purchasing the assets and that Converse did not fuel this interest. Converse did not tell Connecticut General that it thought Tyer's assets were selling for approximately $1,600,000 less than their real value or that it expected to make an additional $500,000 per year in profits as a result of the acquisition. Moreover, Converse did not tell Connecticut General anything about its plan involving the Bermuda trusts and the payment of long-term, highly subordinated debentures. Yet this plan was formulated at a time when Converse and Connecticut General were just beginning their discussions.[20] We therefore think that Converse's plan from the outset was to "ease out" Connecticut General and thereby double its indebtedness to First National. In this way the number of parties would be reduced, First National would be rewarded, and the stage would be set for the participation of the Bermuda trusts.

*Second*, we find that the infusion of $250,000 of new money into Converse was not an actual prerequisite for First National's commitment to finance the Tyer acquisition. Respondent is correct in characterizing this as a "mere makeweight," fashioned to give the involvement of the Bermuda trusts the color of a business purpose. Petitioners' strongest evidence is the testimony of Converse's loan officer at First National. At trial he stated that the ultimate rationale for the alleged requirement was the bank's desire to see Converse's "good faith": "After all, credit is a matter of good faith." The respondent attacks this evidence on the grounds that the witness was a close business associate of the Stones, that he handled the banking affairs of several other Stone family corporations, that First National was paid a $30,000 fee for its financing commitment, and that Converse doubled its line of borrowing from First National in connection with the Tyer purchase. We note, in addition, that the $250,000 requirement—indeed, the shape of the entire transaction, including the role of the Bermuda trusts—was established at the first conference between Stephen Stone

---

[20] The discussions between Converse and Connecticut General lasted from Jan. 19 to mid-February, 1961. Rudnick mapped out the Bermuda trusts' role in a letter to the Butterfield Bank, the trustee, on Jan. 26, 1961.

and the loan officer at the loan officer's home; that the loan officer was subsequently given an unusual amount of authority to negotiate with Connecticut General on Converse's behalf; that the loan officer apparently did not object to the price paid to the Bermuda trusts; that Converse was not made to assign its accounts receivable or inventory; and that, in later years, First National loaned Converse an additional $7 million, bringing the total amount loaned to $13 million, without ever requiring any additional capital. While there are additional reasons for our conclusions, we think the foregoing discussion supports our view that petitioners expect too much from the evidence they have presented.

*Third,* we find that the Bermuda trusts were either related to or under the control of Converse. The determination is important because, in our opinion, the Bermuda trusts acted at the direction of Converse in purchasing and reselling the Tyer assets. The question which we have sought to answer is whether the trusts were in a position to bargain with Converse at arm's length or were, in reality, under Converse's thumb. The answer, we think, lies not in a statutory definition of "related parties," such as the one found in section 267, but in a close inspection of the documentary evidence, especially the trust instruments, and the conduct of the parties. With regard to the relationship of the parties, the petitioners argue on brief that "the instant case does not involve the transfer of property between controlled entities, for Converse and the Bermuda trusts are entirely unrelated and distinct entities." They have not proved this to our satisfaction. The record shows that all the stock of Converse is held by a trust; the trust's settlor is N. Louis Stone; its beneficiaries are 21 members of the Stone family; its trustees are Dewey D. Stone, Harry K. Stone, and Stephen A. Stone. The Bermuda trusts are settled by the same person, N. Louis Stone, and appear to benefit—although the record is fuzzy [21]—substantially the same persons, their wives, or their children. With regard to the control exercised by Converse over the trusts, the petitioners state that "the facts are that representatives of Converse Rubber Corportion discussed long-term investments with the Advisory Committees, but it was the Advisory Committees that made the decisions in issue." But this too is unsubstantiated. In fact, the evidence indicates that Rudnick, who was vice president and general counsel of Converse, was also an executive member of all but one of the seven advisory committees and that he was in a position to, and actually did, direct every detail of the trusts' involvement. There is no evidence that Rudnick or any other member of the advisory committees represented the trusts'

---

[21] See our Findings of Fact with regard to the "private annuities" issue, especially the first chart.

economic interests in opposition to Converse's interests. There is no evidence that any member of the advisory committees haggled with Converse over the terms of the $250,000 loan. And there is no evidence that Butterfield Bank, the trustee, exercised any independent judgment in carrying out Rudnick's directives. Cf. *Egbert J. Miles*, 41 T.C. 165 (1963).

The cases relied upon by petitioners do not require a different result. In *Ransom W. Chase*, T.C. Memo. 1965-202, a corporation entered into negotiations with another corporation to secure the future use of certain vital patents. At some point in the negotiations, the licensor proposed a sale in lieu of a license. The licensee corporation turned down the offer for business reasons. The offer was subsequently taken up by a partnership consisting of the major stockholders of the licensee. The partnership then licensed the corporation to use the patents in return for reasonable royalties. The Commissioner disallowed the deduction of royalty payments by the corporation on the ground that the corporation was in substance the purchaser of the patents. At trial and on brief, the Commissioner avoided taking the position that what took place was unreal or a sham. His only contention was that the substance of the facts differed from their form. Purely on the facts as presented therein, we found that the partnership was the purchaser of the patents. At no time did the corporation ever intend or contemplate being the owner. The selling corporation dealt with the partnership as owner. The partnership was an entirely separate business entity. The money used to purchase the patents came from the private resources of the individual partners, not from the corporation. The corporation never made any representations that it was the owner of the patents.

In *A. F. Lowes Lumber Co.*, T. C. Memo. 1960-141, another case relied upon by the petitioners, the corporation, a logging company, could have purchased certain timberland within its logging area. It did not however. Instead, a partnership was formed; it purchased the land with funds advanced by the company; and it sold the timber to the company for a stumpage fee. The Commissioner determined that the company was in fact the purchaser and owner of the timber and disallowed the deduction of the fee to the extent that it was in excess of the original cost. We found that the parties intended that the timber be acquired and owned by the partnership and that the facts coincided with this intent. We found no sham. In both *Chase* and *Lowes Lumber Co.*, the parties intended, and we found, that the form of the transactions reflected the substance of those transactions. Both cases were decided on their peculiar facts. By contrast, we find herein that the parties intended to make use of the form of

the transaction (the three-cornered transaction) only as a guise. The form was a sham and can be disregarded. As for the *Glasgow Village Development Corporation* case, we found that the third-party purchaser—the president of the company, which 3 years later purchased the property from him—acted on his own behalf and not on behalf of the corporation. *Glasgow Village Development Corporation, supra* at 701. And as for *Brown*, a sale-leaseback case, the court stated therein: "What is controlling is that there came into the picture a new independent owner, the trustee, who was in a position to and did require the payment of the rents and royalties as a condition to the continued use and possession of the lands by the taxpayers," *Brown* v. *Commissioner, supra* at 929. Here, the Bermuda trusts were not in such an independent position—their position was more like that of an agent or a nominee.

We turn next to the related issues concerning the allowance for depreciation, the deduction of interest on the $250,000 indebtedness, and the amortization of deferred interest on the $1,600,000 indebtedness. The first of these is resolved by our decision that the second series of debentures (with a face value upon issuance of $1,600,000) must be excluded from the cost basis of the acquired assets. Since the cost basis of property is the principal ingredient in the adjusted basis of property (i.e., the basis on which depreciation is computed), it follows that the adjusted basis of the assets must likewise be reduced and annual depreciation must be recomputed. Secs. 170, 1011, 1012, and 1016. We so hold.

With respect to the section 163 deductions claimed in connection with the $250,000 debentures, we think that they can be allowed only in part. As we view the facts, the Bermuda trusts acted as Converse's nominee in borrowing funds from another group of trusts and paid 4-percent interest thereon. It is not clear exactly how much the Bermuda trusts borrowed and how much of this was passed on to Converse in exchange for the debentures. However, to the extent that the $250,-000 loan to Converse represented borrowed money rather than the trusts' own funds, Converse's interest deduction must be limited to 4 percent. *Louis Adler Realty Co.*, 6 T.C. 778 (1946). Respondent disallowed the deduction in toto on the grounds that the interest payments were not "ordinary and necessary" and were devoid of any "business purpose." These requirements, however, do not apply to this type of deduction. E.g., *Nicholas D. Wusich*, 35 T.C. 279 (1960), acq. 1961–1 C.B. 4; *Casy O'Brien*, 36 T.C. 957 (1961), affirmed on other grounds 321 F. 2d 227 (C.A. 9, 1963); *Woodward* v. *United States*, 106 F. Supp. 14 (N.D. Iowa 1952), affd. 208 F.2d 893 (C.A. 8, 1953); *McNutt-Boyce Co.*, 38 T.C. 462 (1962), affirmed per curiam 324 F.2d

957 (C.A. 5, 1963); *L. Lee Stanton*, 34 T.C. 1 (1960). Also this separate loan transaction was not a sham because the loan was actually made, albeit through a nominee. See *Fabreeka Products Co.* v. *Commissioner*, 294 F.2d 876 (C.A. 1, 1961); *Granite Trust Co.* v. *United States*, 238 F.2d 670 (C.A. 1, 1956); *Taggart* v. *United States*, an unreported case (S.D. N.Y. 1970, 26 A.F.T.R.2d 70-5118, 70-1 U.S.T.C. par. 9436); and *Murray Kay*, 44 T.C. 660 (1965).

The deductions claimed in connection with the amortization of the deferred interest on the second series of debentures present different problems. The petitioners argue that the notes are valid and should be recognized as such and that Converse is entitled to a deduction under section 163 for the annual amortization of the interest accrued. The question of whether the deferred interest was properly accrued depends, they claim, upon whether Converse could have entertained a reasonable expectation that the interest expense would ultimately have to be paid. *Helvering* v. *Russian Finance & Construction Corporation*, 77 F.2d 324 (C.A. 2, 1935), affirming a Memorandum Opinion of the Board. Respondent submits that the prerequisites of an accruable liability are (1) the liability must be binding and enforceable; (2) the liability must not be contingent upon the happening of a future event; and (3) there must be a reasonable belief on the part of the debtor that the liability will be paid in due course. He focuses upon the subordination provision of the debentures, arguing that it causes the debentures to be too contingent.[22]

In our opinion the debentures do not represent genuine indebtedness. See and compare *Tampa & Gulf Coast Railroad Co.*, 56 T.C. 1393 (1971), on appeal (C.A. 5, Mar. 17, 1972). The crucial question is whether a normal debtor-creditor relationship arose at the time Converse issued the debentures to the trusts. This is a factual question. *Lukens Steel Co.*, 52 T.C. 764 (1969), affd. 442 F.2d 1131 (C.A. 3, 1971); *United Control Corporation, supra.* See also *Gooding Amusement Co.*, 23 T.C. 408 (1954), affd. 236 F.2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957); *Brake & Electric Sales Corporation* v. *United States*, 287 F.2d 426 (C.A. 1, 1961). The fact that the label "Ten Year Subordinated Promissory Notes" was used and that the purported debt was entered on Converse's books is not controlling. E.g., *Fin Hay Realty Co.* v. *United States*, 398 F.2d 694, 697-698 (C.A. 3, 1968); *Brake & Electric Sales Corporation* v. *United States, supra*; *Gilbert* v. *Commissioner*, 248 F.2d 399, 409 (C.A. 2, 1957). The following facts do relate to the question at hand. The notes are highly

---

[22] The respondent does not argue that the deduction must be disallowed because the purchase-of-assets transaction which spawned them was a sham. See *Knetsch* v. *United States*, 364 U.S. 361 (1960), where the debt itself was a sham. See also *Goodstein* v. *Commissioner*, 267 F.2d 127 (C.A. 1, 1959), affirming 30 T.C. 1178; *Sonnabend* v. *Commissioner*, 267 F.2d 319 (C.A. 1, 1959), affirming a Memorandum Opinion of this Court.

subordinated—they cannot be repaid so long as there is any outstanding indebtedness for money borrowed prior or subsequent to issuance of the notes.[23] Converse controls both sides of the relationship. Not only is it theoretically able, through Rudnick, to control the Bermuda trusts, but it has demonstrated this ability and a willingness to exercise it by directing the participation of the trusts in the Tyer acquisition. The purported debt was not supported by any consideration.[24] No interest has actually been paid. The original date for payment has come and gone and a new date has been agreed to by the trusts without any fuss; and no one expects that repayment will occur even then. There is no provision for special remedies upon default.[25] Lastly, we are cognizant of the fact that Converse's motive for issuing the notes was, at least in part, to obtain the interest deduction as well as to step up the cost basis of the assets. See *Commissioner* v. *Tower*, 327 U.S. 280 (1946). In light of all the facts and the absence of a preponderance of proof to the contrary, we conclude that the notes in question cannot support the claimed deduction. Whatever they are, they are not debt.

The cases cited by the petitioners, *Russian Finance* and *United Control*, are inapplicable where the "indebtedness" is not recognized. We also note that the court in the *Russian Finance* case discusses the concept of "accruability" in terms of "the normal course of business." [26] Here, nothing touching upon the issuance of the $1,600,000 notes occurred in "the normal course of business." And with regard to the *United Control* case, we note that in that case there was no evidence of any attempted evasion or abuse. *United Control Corporation*, *supra* at 971.

In addition, we are convinced that the only reasons Converse issued the notes were (1) to get the stepped-up basis, (2) to obtain the in-

---

[23] The subordination feature also bears upon the intention of the holder to act like a creditor and the reasonableness of his expectation of repayment. See Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 424 (1971).

Petitioners argue on reply brief that a typographical error appears in the subordination provision of the specimen promissory note, the note made payable to the Harry K. Stone Family Trust in the amount of $779,513.52. They claim that the language quoted in our Findings of Fact should read, in part, as follows:

"The corporation will not *prepay* [as opposed to *repay*] any part of the principal amount of this note while any such superior indebtedness remains unpaid. [Emphasis added.]"

They do not say whether the same error appears in the other six notes. In the absence of further and better proof, we reject this argument.

[24] It is not necessary to specify at this time whether this was a gift or a dividend distribution because the notes have no ascertainable value (so the individual petitioners are not taxable thereon) and the question of a gift tax is not before us.

[25] There is only the right to receive interest at the rate of 6 percent per annum. The record does not show whether this right is being enforced.

[26] "The basis of the accrual system of accounting is that obligations incurred in the normal course of business will be discharged in due course. * * * When books are kept on an accrual basis, a presently existing obligation which, in the normal course of events, the taxpayer is justified in believing he must fulfill, may be accrued. [*Helvering* v. *Russian Finance & Construction Corporation*, 77 F.2d 324, 327 (C.A. 2, 1935), affirming a Memorandum Opinon of the Board.]"

terest deduction, and (3) perhaps to prepare the way for a future "pay out" of profits. This being the case, the claimed deduction simply falls outside the intendment of section 163. *Goldstein* v. *Commissioner*, 364 F.2d 734 (C.A. 2, 1966), affirming 44 T.C. 284 (1965). The Second Circuit stated that the congressional purpose underlying section 163 was the encouragement of "purposive activity" to be achieved through borrowing and that the borrowing of funds in order to engage in a transaction that has no substance or purpose aside from the taxpayer's desire to obtain the tax benefit of an interest deduction is not such a "purposive activity."

When it enacted Section 163(a) Congress could not have intended to permit a taxpayer to reduce his taxes by means of an interest deduction that arose from a transaction that had no substance, utility, or purpose beyond the tax deduction. [*Goldstein* v. *Commissioner, supra* at 742.]

While the *Goldstein* analysis does not contemplate a situation where nothing was received in exchange for the alleged indebtedness, the holding is nonetheless pertinent to the present case. Another distinction is that here the petitioners wanted not only to take advantage of the interest deduction but also to reap the benefits of an inflated cost basis. Needless to say this latter distinction does not call for a different result.

With regard to this deferred-interest issue, petitioners also claim that the respondent acted arbitrarily in disallowing the deferred-interest deduction in its entirety. They argue that the notes represent part of the cost of the Tyer assets to the extent of the $63,500 expended by the Bermuda trusts to acquire the option. Again it is unclear how much of this $63,500 came from the trusts' own pocket and how much came out of the funds borrowed at Converse's direction from the second group of trusts. We can surmise that the trusts had some funds at the time the trustee wrote the check to F. W. Richmond & Co., Inc., but we do not know how much. We therefore hold that to the extent that the $63,500 represented funds other than funds borrowed at Converse's behest, it is a part of the cost of the acquired assets. The portion of the $1,600,000 indebtedness which is allocable to this expenditure (all or part of $63,500) on Converse's behalf is, thus, valid indebtedness supported by consideration. The amortized interest with respect to that portion is properly deductible.

The last subsidiary issue concerns the reallocation of the purchase price, as determined above, among the assets acquired from Tyer. In the agreement between Tyer and Richmond Rubber Co., Inc., Tyer guaranteed the collection of the accounts receivable that it was selling and agreed to reserve $500,000 to insure the payment of any deficiency that might develop. When Converse purchased the stock of Richmond Rubber Co., Inc., it (Converse) became the beneficiary of Tyer's guarantee and the reserve provision. Respondent, in the ex-

planation of adjustments accompanying his deficiency notice, treats accounts receivable as a non-"cash or equivalent" item, assigning this item a value of $1,116,331.83 as opposed to $1,597,182.96, its face value. Converse contends that the accounts receivable are the equivalent of cash. On this point we agree with the petitioners.

While section 1012 provides that the basis of property is its cost, neither the Code nor the regulations explain how the cost of separate categories of assets acquired in a lump-sum purchase is to be determined. This Court, however, has confronted the problem on many occasions; and it has established several fundamental rules. For instance, it has been said that when a taxpayer buys a mixed group of assets for a lump sum, the purchase price will be allocated among the assets in accordance with the relative value that each item bears to the total value of the group of assets purchased. *Nathan Blum*, 5 T.C. 702 (1945); *C. D. Johnson Lumber Corporation*, 12 T.C. 348, 363 (1949); *F. & D. Rentals, Inc.*, 44 T.C. 335, 345–346 (1965), affd. 365 F.2d 34 (C.A. 7, 1966), certiorari denied 385 U.S. 1004 (1967). This Court has also stated that "the purchaser should eliminate from the allocation whatever *cash and its equivalents* he acquires. A sufficient amount of the purchase price is apportioned to these assets so that their bases are their face or book values. The balance of the purchase price is allocated to the remaining assets." *Victor Meat Co.*, 52 T.C. 929, 931 (1969). And a cash equivalent item has been described as "the *equivalent of money in the bank.*" *F. & D. Rentals, Inc., supra* at 347.

In the case of *F. & D. Rentals, Inc.*, the mixed group of assets acquired by the purchaser included guaranteed accounts receivable. The buy-sell agreement provided that "All accounts receivable acquired shall be guaranteed by sellers and after 150 days from date of closing all uncollected receivables shall be delivered to sellers and balance due thereon credited to buyers." 44 T.C. at 337. Everyone—the taxpayer, the Commissioner, and this Court—treated the guaranteed accounts receivable as a cash equivalent item. [27]

The case of *Victor Meat Co., supra*, in which accounts receivable were held not to be the equivalent of cash, is distinguishable. There the trade receivables were open accounts, "payment of which was completely dependent upon the unsecured credit of Miller's [the seller's] customers." *Victor Meat Co., supra* at 932.

Here, as in *F. & D. Rentals, Inc.*, the accounts receivable were guaranteed. In the buy-sell agreement between Tyer and Richmond

---

[27] See table, 44 T.C. at 342. One of the issues in *F. & D. Rentals, Inc.*, 44 T.C. 335 (1965), was whether inventory should be treated as a cash equivalent item. At p. 346 of the opinion, it is stated:

"We are not at all convinced that a realistic allocation would have accorded these categories of inventory the same dollar-for-dollar values, equal to the seller's book values, *such as was done in the case of the cash and the guaranteed accounts receivable, prepaid expenses, and the like.* [Emphasis added.]"

Rubber Co., Inc., Tyer agreed not only to guarantee the accounts but also to set aside $500,000 to "back up" its guarantee. There is no evidence that these provisions were in any way unrealistic or insufficient. We therefore see no reason for treating the accounts receivable of Tyer as anything other than a cash equivalent item.

## 2. The "Private Annuities"

On June 28, 1960, the Bermuda trusts were created for the purpose of selling "private annuities" to eight of the individual petitioners. [28] N. Louis Stone was named as settlor in each of the trust indentures; the Butterfield Bank was named as trustee; and, with respect to each trust, $1,000 was transferred to the trustee for the benefit of named beneficiaries, the children or grandchildren of one of the petitioners. While each trust bore the name of the petitioner whose descendants were benefited, the petitioners themselves were not named as cosettlors, trustees, or beneficiaries. The trust instruments provide, in general, for the accumulation and reinvestment of trust income until after the death of the petitioner for whom the trust was named. They also expressly provide for (1) an "Advisory Committee" with plenary power to deal with the assets of the trust, (2) the avoidance of liability on the trustee's part due to any act committed in accordance with advisory committee directives, (3) the removal of the trustee by the settlor or, in the event of his death or disability, by the advisory committee, (4) the possibility of interest-free, unsecured loans to the petitioner for whom the trust was named, (5) the possibility of the payment of premiums on insurance policies covering the life of this same petitioner, and (6) the possibility of the appointment of this same petitioner as "Voting Trustee," entitling him to hold and vote trust securities. The petitioner for whom a particular trust is named can also qualify as a member of the advisory committee of that trust. During the period in question the advisory committee of five of the trusts was composed of Abraham Stone, Alford P. Rudnick, Joshua A. Guberman (a member of Rudnick's law firm), and Avram J. Bennett. [29] Rudnick, as executive member of the six committees on which he sat, orchestrated the operations of *all* of the trusts. [30]

---

[28] This summary of the facts is somewhat simplified. The full details are contained in our Findings of Fact.

[29] The advisory committee of The Abraham Stone Family Bermuda Trust consisted of Hugh D. Stone (Abraham's nephew), Alford P. Rudnick, Joshua A. Guberman, and Avram J. Bennett. The advisory committee of The Alford P. Rudnick Family Bermuda Trust consisted of Abraham Stone, Joshua A. Guberman, Matthew Brown (another member of Rudnick's law firm), and Avram J. Bennett. The record does not yield any information about Bennett, except the fact that he lives in Canada.

[30] We note, among other things, that in his letter to the trustee dated Jan. 26, 1961, giving instructions with regard to the Tyer purchase transaction, Rudnick spoke on behalf of all of the advisory committees—including the one to which he did not belong—and did not state that the decisions contained therein were duly arrived at in accordance with art. 20, par. (6), of each trust indenture, as required by said provision.

On the same day that the trusts were created (June 28, 1960), the six petitioners for whom the trusts were named, plus two of their spouses, purportedly purchased noncommercial "annuities" from their "namesake" trusts. [31] Each "annuitant" transferred shares of stock in a Stone-family-held Puerto Rican corporation, Coastal, in exchange for a promise by his or her "namesake" trust to pay annual "annuity payments." The amount of the annual payment in each case was computed on the basis of the fair market value of the shares at the time of transfer, [32] the life expectancy of the individual "annuitant," and an interest factor.

On July 5, 1960, Coastal paid a dividend of $20 per share (in the form of interest-bearing notes) on the shares then in the hands of the Bermuda trustee. Then, on December 13, 1960, the shares were finally redeemed for $2 per share.

In 1961, the year before the Court, the trusts received both interest and redemption income with respect to the Coastal notes and stock, and interest income with respect to the $250,000 debentures issued by Converse in connection with the Tyer purchase.

The taxpayer-"annuitants" reported the annual payments as part return of capital and part ordinary income under section 72. The respondent determined that the taxpayers "actually and/or constructively realized" ordinary income as a result of the above transactions.

On this issue, respondent argues (1) that the trusts are invalid, (2) that, if valid, the trusts should not be recognized (citing *Irvine K. Furman*, 45 T.C. 360, affd. 381 F.2d 22 (C.A. 5, 1967)), and (3) that, if valid and recognizable, the petitioner-annuitants should be treated as the true settlors and taxed under section 677(a) of the grantor trust provisions, citing Rev. Rul. 68–183, 1968–1 C.B. 308. Petitioners reply, in short, that the trusts are valid and the annuities are regular in both form and substance. [33]

It is our view that respondent's first two arguments are unsupported by the record and case law. Although the trusts are obviously very flexible vehicles, they are nonetheless valid and should be recognized

---

[31] The two wives purchased annuities from the trusts named for their husbands. We note that under the provisions of those two trusts, the wives, as "primary beneficiaries," did not have a right of withdrawal.

[32] The fair market value of the total number of shares transferred by the nine annuitants was $900,000. This figure equaled the amount of accumulated earnings and profits of Coastal.

[33] The petitioners make another argument. They claim that respondent stipulated that the petitioners *sold* the Coastal shares to the trustee and thereby foreclosed the argument that this "sale" was in effect a "funding" of the trusts. We disagree with this interpretation. As we view it, the stipulation merely says that the annuity agreements were entered into and under the terms of those agreements the petitioners sold stock to the trusts. We do not think respondent intended to stipulate as to the substantive character of petitioners' acts. Moreover, there was no indication at trial or thereafter that petitioners were misled with regard to respondent's theory on this issue. Cf. *Adolph Weinberg*, 44 T.C. 233 (1965), affirmed in part and reversed in part without discussion of this point *Commissioner* v. *Sugar Daddy, Inc.*, 386 F.2d 836 (C.A. 9, 1967).

as such for Federal tax purposes. The fact that 7 months later Converse, through Rudnick, directed the participation of the trusts in the Tyer purchase transaction does not negate the existence of the trusts. Also, the vesting of extraordinary powers in the advisory committee does not ipso facto invalidate the trusts, given the facts and provisions at hand. See generally, Restatement (Second), Trusts, sec. 185; 2 Scott, Trusts, sec. 185. The *Furman* case is distinguishable on its facts.

Respondent's third argument is really an amalgam of different arguments. First, he maintains that N. Louis Stone is the nominal settlor of the trusts and the petitioner-annuitants are the true settlors. After all, he reasons, petitioners are the ones who transferred $900,000 worth of stock to the trust and then caused the dividend and redemption income to follow the stock. N. Louis Stone transferred a total of only $7,000;[34] and this was surely done as an accommodation to his brothers, niece, and nephew—the annuitants. Next, respondent applies section 677(a) to the facts as cast by him: The annual "annuity payments" by the trusts to the petitioners are not really "annuity payments" at all. Instead, they represent reserved income (on the transferred Coastal stock) that is being paid out to petitioners over their lifetimes. What has happened is that the individual petitioners have transferred this property in trust to the Bermuda trustee and reserved a life interest in its income. Since the petitioners are the true settlors of these trusts, the annual payments must be treated as amounts distributed without the approval or consent of any adverse party under section 677(a)(1) and taxed in accordance with section 671. Why the transaction should be viewed as a "transfer-with-retention" rather than a sale of the stock for an annuity is explained as follows: "Respondent is here attacking the validity of the alleged annuity agreements on the grounds that the trusts had no significant income-producing assets other than the property transferred for the annuities."

Having aired respondent's argument for recasting the "annuitants" as grantors and the "annuity payments" as trust distributions, we must say that we think there is a simpler, more direct, and less theoretical reason for reaching the same result[35] That reason is that the annuity

---

[34] Again, this is a simplification.

[35] "the rule is well established that a deficiency may be approved on the basis of reasons other than those relied upon by the Commissioner or even where his reason may be incorrect. *Blansett* v. *United States*, 283 F.2d 474, 478–479 (C.A. 8) ; *Bernstein* v. *Commissioner*, 267 F.2d 879, 881–882 (C.A. 5) ; *Acer Realty Co.* v. *Commissioner*, 132 F.2d 512, 514–515 (C.A. 8) ; *Alexander Sprunt & Son.* v. *Commissioner*, 64 F.2d 424, 427 (C.A. 4) ; *Crowell* v. *Commissioner*, 62 F.2d 51, 53 (C.A. 6) ; *J. & O. Altschul Tobacco* v. *Commissioner*, 42 F.2d 609, 610 (C.A. 5) ; *Hughes* v. *Commissioner*, 38 F.2d 755, 757 (C.A. 10) ; *John L. Chipley*, 25 B.T.A. 1103, 1106 ; *Edgar M. Carnick*, 21 B.T.A. 12, 21 ; cf. *Helvering* v. *Rankin*, 295 U.S. 123, 132–133. [*Wilkes-Barre Carriage Co.*, 39 T.C. 839, 845–846 (1963), affirmed per curiam 332 F.2d 421 (C.A. 2, 1964).]"

See also *Helvering* v. *Goweran*, 302 U.S. 238, 245–247 (1937).

We need not express an opinion as to the correctness of respondent's reasoning as stated in this case or in Rev. Rul. 68–183.

payments were never intended to be, and objectively are not, annuity payments. To us it is obvious that the entire transaction was designed to allow petitioners to maintain control over the property transferred and its proceeds, while claiming the benefits of so-called private annuitants. For a discussion of the benefits, see Midgley, "Federal Income Taxation of Private Annuitants," 40 Geo. Wash. L. Rev. 679 (1972). Thus, the maintenance of control is the key to deciding this issue since it is decisive of the question of the recognizability of the annuities. And, if the annuities are not recognizable, the annuitants *can* properly be recast as grantors and the payments, which are not "annuity payments," *can* be characterized as distributions falling within section 677.

In the *Samuel* case the Court of Appeals for the First Circuit analyzed the normal annuity situation in the following terms:

once the annuitant has transferred the cash or property to the obligor and has received his contractual right to periodic payments, he is unconcerned with the ultimate disposition of the property transferred * * *.

* * * However, here, the petitioner—the asserted annuitant—in his capacity as co-trustee, provided for *effective control* of the property including the right to retain the scrolls indefinitely. [*Samuel* v. *Commissioner*, 306 F.2d 682, 687 (C.A. 1, 1962). Emphasis added.]

At another point, in the course of distinguishing *Becklenberg's Estate* v. *Commissioner*, 273 F.2d 297 (C.A. 7, 1959), the court stated: "Moreover, in Becklenberg's Estate, the decedent was not a trustee and had no power of management over the trust. She did not retain any *effective control* over the property in contrast to petitioner here." *Samuel* v. *Commissioner*, *supra* at 689. (Emphasis added.) *Becklenberg's Estate* is an estate tax case concerning the includability in decedent's estate of property transferred to a trust in exchange for an annuity.

The test of control that can be drawn from *Samuel* is an eminently practical one. Did the purported annuitant transfer so many incidents of ownership that it can be said that he or she no longer has effective control over the property? We believe that this test should be applied in a strict fashion in order to curb abuses in the area of private annuities. The outcome in each case will depend upon the attendant facts as viewed, we hope, in the light of reality. The fact that "annuity agreements" were executed is, of course, not controlling. *Harold W. Smith*, 56 T.C. 263 (1971); *Estate of Cornelia B. Schwartz*, 9 T.C. 229 (1947). Also, it should be noted that the *Samuel* test need not coincide with similar-sounding tests in other areas of the tax law where other considerations may be at work, for example, the test carefully constructed by Congress in sections 671 through 678, the test appearing under the family partnership provisions (see *Adolph K. Krause*, 57 T.C. 890

(1972), and the legislative history, regulations, and cases cited therein), and the specific tests of section 2036 (see *United States* v. *Byrum*, 408 U.S. 125 (1972), petition for rehearing pending; *Estate of Pamelia D. Holland*, 47 B.T.A. 807 (1942), and Supplemental Opinion, 1 T.C. 564 (1943); *Estate of William F. Hofford*, 4 T.C. 542 (1945), and Supplemental Opinion, 4 T.C. 790 (1945)).

In this case it is plain that the petitioner-"annuitants" deliberately avoided relinquishing control over the stock and its proceeds. Through the advisory committees they could continue to deal with the property as before—with a free hand. They could direct its investment; they could borrow it without payment of interest or providing security; they could use it to purchase life insurance; they could have themselves appointed as "Voting Trustees" and vote stock. It cannot be said that the advisory committees were not susceptible to the petitioners' directions because we find that they were, based on the closeness of family relations, the tendency of the trusts to act in tandem, and the solidarity of the trusts as demonstrated during the Tyer purchase transaction. Nor can petitioners rely on the fact that title to the property was technically in the name of the trustee. *Corliss* v. *Bowers*, 281 U.S. 376 (1930). And any suggestion that the committees and the Bermuda trustee must act perforce to benefit the named beneficiaries is undercut by the fact that the trustee is absolved of any liability and the trust income, while subject in some instances to a limited right of withdrawal, is not distributable until after the death of the petitioner for whom the trust was named. Cf. *Estate of Willard V. King*, 37 T.C. 973 (1962), an estate tax case.

Some analogous cases in the section 2036 area are instructive. In *Estate of Pamelia D. Holland*, *supra*, the decedent and her husband "sold" to their children all the stock of a corporation for a nominal amount of money. At the same time it was agreed that the father was to be paid a "salary" of $25,000 per year for as long as he lived and if he predeceased his wife, she was to be paid the same "salary" for as long as she lived. The father did predecease the mother, and upon her death the Commissioner determined that the value of the stock should be included in her estate. We agreed with the Commissioner's determination. Although the payments were labeled as salary payments, were not specified as company profits or dividends on stock, and were paid pursuant to a valid contract, in essence they represented a retained income interest. In the recent case of *United States* v. *Byrum*, *supra*, the Supreme Court discussed *Holland* and concluded that "The settlor in Holland retained a considerably greater interest than Byrum retained, including an income interest." *Holland* was also discussed, at length, in *Estate of William F. Hofford*, *supra*, a case involving

very similar facts. In *Hofford* we found that the salary payments were in fact just that—salary payments. We noted, among other things, that when the recipient of the payments attempted to exercise control over the transferred property by attempting to oust his cotrustees, he failed. Suffice it to say that if the present case were a section 2036 case, we would treat it as having more in common with *Holland* than with *Byrum* or *Hofford*. Not only have petitioners retained a greater interest than did the petitioner in *Byrum*, but in contrast to the petitioner in *Hofford*, the petitioners in this case have succeeded on at least one occasion in directing the trusts.

In view of our conclusion that the annual payments were not annuity payments, we find that the individual petitioners were the settlors of the Bermuda trusts. They furnished the consideration for the creation of the trusts. The named settlor was settlor in form only. Cf. *Harold W. Smith, supra; Estate of Cornelia B. Schwartz, supra; George H. Whiteley, Jr.*, 42 B.T.A. 402, affd. 120 F. 2d 782 (C.A. 3, 1941), certiorari denied 314 U.S. 657 (1941); *Buhl v. Kavanagh*, 118 F.2d 315 (C.A. 6, 1941). Furthermore, we hold that the annual payments represent amounts distributable without the consent or approval of an adverse party under section 677(a)(1).[36] The purported annuity agreements amounted to little more than prearranged distributions. The petitioners are therefore taxable on the income of the trusts during 1961 as owners of those trusts under section 671.

### 3. *Additions to Tax Under Section 6653(a)*

Respondent determined that additions to tax under section 6653(a) should be made in the case of Reva G. Stone, deceased (docket No. 5104–65), and Dewey D. and Anne A. Stone (docket No. 5105–65). Although the question was put in issue by the pleadings, it was not mentioned by the parties at trial or on brief. It is unclear to us whether the additions to tax relate to one of the two major issues discussed above or to some of the other issues which have been settled by agreement of the parties.

Section 6653(a) provides, in part, as follows: "If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment."

The petitioners have the burden of proof on this issue. *Vaira v. Commissioner*, 444 F.2d 770 (C.A. 3, 1971); *Cleveland Chiropractic College v. Commissioner*, 312 F.2d 203 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court; *Inter-American Life Insurance Co.*, 56

---

[36] We need not pass on the possibility that petitioners, as settlors, might be taxable under another grantor trust provision—such as sec. 677(a)(3).

T.C. 497 (1971), on appeal; *Terry C. Rosano*, 46 T.C. 681 (1966); *Harold E. Harbin*, 40 T.C. 373 (1963); *Carroll F. Schroeder*, 40 T.C. 30 (1963). Since they have failed to prove that the respondent's determination is erroneous, or even to clarify the issue, they must suffer the consequences. *James S. Reily*, 53 T.C. 8 (1969); *James W. England, Jr.*, 34 T.C. 617 (1960). See also *Journal Co.*, 46 B.T.A. 841 (1942), reversed on another ground 134 F.2d 165 (C.A. 7, 1943). Under the circumstances we are impelled to sustain the respondent's determination as to the additions to tax.

To reflect the concessions made by the parties and the conclusions reached herein,

> *Decisions in all dockets will be entered under Rule 50.*