GEORGE H. WHITELEY, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 92899, 92900.   Promulgated July 23, 1940.

*Frederick H. Spotts, Esq., Robert C. Fluhrer, Esq.,* and *A. Chauncey Newlin, Esq.,* for the petitioner.

*Brooks Fullerton, Esq.,* for the respondent.

OPINION.

*Issue 1.*

DISNEY: The major difference between the parties here is whether the form or the substance of the transaction should prevail; that is, whether petitioner or his wife should be treated here as the grantor of the trust. The gist of the petitioner's argument is that his wife was the grantor both in substance and form, upon the ground that she received the bonds and note from him unconditionally. He contends that the situation here is no different from what it would be if the trust had been created by his wife out of property which had never belonged to him. Respondent insists upon brief that, with the exception of the insurance policies, the value of which, he says, was negligible, the property transferred in trust belonged to the petitioner, and that it was mutually understood that the transfer was made to secure the wife against loss of her property then at risk in his stock trading account and not to pass ownership. Respondent relies upon sections 166 and 167 of the 1932 Act.[1] He makes no contention that the question is governed by section 22 (a).

---

[1] SEC. 166. REVOCABLE TRUSTS.

Where at any time during the taxable year the power to revest in the grantor title to any part of the corpus of the trust is vested—

(1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, or

(2) in any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom,

then the income of such part of the trust for such taxable year shall be included in computing the net income of the grantor.

SEC. 167. INCOME FOR BENEFIT OF GRANTOR.

(a) Where any part of the income of a trust—

\*        \*        \*        \*        \*        \*        \*

(3) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, applied to the payment of premiums upon policies of insurance on the life of the grantor (except policies of insurance irrevocably payable for the purposes and in the manner specified in section 23 (n), relating to the so-called "charitable contribution" deduction) ;

then such part of the income of the trust shall be included in computing the net income of the grantor.

Petitioner's wife, at the request of Livingstone and Smith, applied for, paid the initial premiums on, and was made the beneficiary of, the insurance policies. The insurance was not taken out as protection to her for the loans of stock and cash she had made to petitioner. They were secured in other ways. It does not appear that the insurance had a cash surrender value at the time of its transfer to the trustee. It was an expense of the trust, not an income-producing asset thereof. The presence in the trust of this insurance does not, in our opinion, demonstrate that petitioner is not the real grantor of the trust, as the respondent contends him to be.

It is clear that the statutory provisions relied upon by the respondent are not controlling if petitioner's wife is to be regarded as the grantor of the trust, for sections 166 and 167 relate only to grantors of trusts. In determining whether petitioner or his wife should be regarded as the grantor of the trust we are not limited to the bare terms of the instrument. Numerous cases hold that transactions between husband and wife must be closely scrutinized to determine their real character. In a case involving the deductibility of a loss resulting from the sale of property to a corporation wholly owned by the taxpayer, the court, in *Higgins* v. *Smith*, 308 U. S. 473, said:

\* \* \* The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property.

In *Johnson* v. *Commissioner*, 86 Fed. (2d) 710, affirming 33 B. T. A. 1003, involving the deductibility of interest on an amount borrowed by the taxpayer from a trust created by his wife with funds furnished by the taxpayer, the court said that: "Despite such purpose [to avoid or minimize taxes], the question is always whether the transaction under scrutiny is in reality what it appears to be in form."

In *Richardson* v. *Smith*, 102 Fed. (2d) 697, the collector contended that certain shares of stock transferred by Richardson to his wife and by her shortly thereafter set up in trust continued to belong to the husband. In ordering a new trial to determine additional facts, the court remarked:

\* \* \* So in this case the transfer may in fact have been intended only to deceive the taxing authorities. It is not necessary that such a mutual understanding shall be explicit or verbal; it may be gathered from the conduct of the parties in a series of transactions, or in any other way. *Johnson* v. *Commissioner*, 2 Cir., 86 F. 2d 710. All that need appear is that the donor did not intend to divest himself of control over the res, that the donee knew

of the donor's intent and assented to it, and that the donor knew of the donee's assent. If all this is fairly inferable from the relations, the gift, however formal, is a sham; but the donor's belief, though well founded, that he can prevail upon the donee to comply with his demands, is alone not enough; it does not put the donee's will under any constraint, and the property becomes unconditionally his. *Marshall* v. *Commissioner*, 6 Cir., 57 F. 2d 633; *Smith* v. *Commissioner*, 7 Cir., 59 F. 2d 533; *Kell* v. *Commissioner*, 5 Cir., 88 F. 2d 453; *Bardach* v. *Commissioner*, 6 Cir., 90 F. 2d 323.

In *Lehman* v. *Commissioner*, 109 Fed. (2d) 99; certiorari denied, 310 U. S. 637, a case involving reciprocal trusts, the court said that "The law searches out the reality and is not concerned with the form" and recognized that one who furnishes the consideration for a trust is a settlor.

Under the general contention of petitioner that his wife was the unconditional owner of the property transferred by her in trust, he argues that the bonds and note "were given outright to the wife" because of the existence of a very large obligation to her for loans of stock and cash. While upon brief he used terms synonymous with the word "gift", he does not specifically contend that the bonds and note were conveyed by way of gift. Such argument would be contrary to a statement made by his counsel at the hearing that he would show a consideration for the transfers. He merely refers to testimony regarding protection to his wife for the financial assistance she had given him as the motive for the transfers. He argues that the facts are unusual, if not unique, and asserts that there is no occasion here to decide the precise character of the transfers, alleging that it is sufficient that the named settlor of the trust was the absolute owner of the property transferred under the instrument.

A brief statement of the facts at this point will be of assistance. The petitioner operated a stock trading account in which there was a debit balance of about $260,000 at the close of 1931 and May 1932. He had on deposit as collateral in the account all of his own stock acceptable to the broker and 6,000 shares of preferred stock of the Commonwealth & Southern Corporation which he had borrowed from his wife. In addition he owed his wife $53,000 for cash borrowed to help carry the account. Petitioner was able with some difficulty to meet calls made at various times by the broker for more collateral. In and after December 1931 petitioner and his wife were alarmed about the condition of the account. Petitioner characterized the situation as "critical" and his wife testified that he was "desperate." In their dilemma, petitioner consulted Smith, his father-in-law, and Livingstone, a banker, and "put myself in their hands," and petitioner's wife turned to her father for guidance. Smith had no faith in the ability of petitioner and his wife to solve

their financial difficulties. Smith and Livingstone consulted with each other about the matter and at times with petitioner's wife, and in May the former concluded that some definite action should be taken to correct the situation. A trust was thought of by Livingstone as early as December 1931; in May 1932 the one in controversy was executed.

The evidence clearly shows a willingness on the part of the petitioner and his wife to conform their acts under the circumstances to the wishes of Livingstone and Smith. Petitioner testified: "I was in a very humble frame of mind, and I was willing to do anything." He informed Livingstone that "*  *  * I wanted him to—anything that I had which I could put up to show my good faith and my willingness to repay my wife and settle my affairs I was perfectly glad and willing to do." Petitioner also testified that he would have executed a note in favor of his wife for a larger amount if she had requested it. The wife testified that she "would have given him [petitioner] everything I had to help him," and, upon being questioned as to whether the bonds and note constituted a charge against petitioner for the help she had given him, she testified: "I was not charging him anything, was I? You see, this is very vague to me." Her lack of understanding of what was being done appears well founded. Livingstone, who alone conceived the idea of having petitioner take out more life insurance, and with Smith requested the execution of the note, in response to a question of whether the note was a charge for the financial assistance the wife had given the husband, testified: "Mrs. Whiteley hasn't anything to do with it. She never thought of $200,000 or twenty-five cents. Mrs. Whiteley was entirely instructed by Mr. Smith and myself." We conclude that the bonds and note were no such charge.

Petitioner also testified that he never consulted his wife about the formation of the trust. However, at least as early as May 24, 1932, when he submitted to a physical examination for life insurance for transfer as part of the corpus of the trust, he was aware of what was being done on his and his wife's behalf, for his wife testified that, when she consulted him about the insurance and creation of the trust, he objected to it. Petitioner became familiar with the terms of the trust about the time he was called to go to the doctor for an examination for insurance. For some time Livingstone, Smith, and petitioner's wife urged him to take insurance, and he objected and refused to go to the doctor for examination, but finally agreed, and took the examinations and on May 24 signed the usual applications. Other testimony is that Livingstone never consulted the petitioner about the trust. The reason is obvious. Petitioner had expressed to Livingstone and Smith a desire to do what-

ever they deemed best under the circumstances and the evidence of record clearly shows that under this delegation of authority the whole plan was conceived and carried out. At all times petitioner's wife acted according to and as she received instructions from Livingstone and her father.

Petitioner contends that the execution of the note under seal imports a consideration. He cites *William Park*, 38 B. T. A. 1118, now on appeal, involving the deductibility of interest paid on a sealed note executed and delivered in Pennsylvania as a gift. The question there turned upon whether an indebtedness had been created within the meaning of section 23 (b) of the Revenue Acts of 1932 and 1934. The issue here is entirely different, and the principle of that case is not controlling.

The record contains no definite proof as to the reason for obtaining the note or why the amount was $200,000. Though there is some evidence that it was regarded by Livingstone and Smith as protection to petitioner's wife, yet Livingstone also testified that the corporate bonds had nothing to do with fixing the amount of the note at $200,000, that the shares of stock of the Commonwealth & Southern Corporation at risk in petitioner's trading account or the greater part of them were secured by petitioner's Dentists' Supply Co. stock, and that the $126,000 par value bonds and the Dentists' Supply Co. stock were ample security for the wife. He testified further:

A. My understanding of the $200,000 is absolutely vague. The only thing I know of is those were hectic times. Mr. Smith and myself and possibly Mr. Whiteley agreed that that was probably—in case of—in fact, I don't know actually, except we thought at that time that was the best thing to do, that was the best arrangement we could make.

Q. Well, was that the only——

A. I don't think that those bonds and that sort of thing came in as any differential or difference between what she had loaned and so forth. I don't think—I don't know but I don't believe that was the pertinent point there.

Q. Well, what did you mean by "differential"?

A. The note itself probably would be considered the settlement at that point of the difference of Mr. and Mrs. Whiteley, so that if either one had died at that point, and the note would have been paid off, I think that is approximately what it was. I can't say definitely. I am sorry.

The note provided for interest without specifying the rate. Interest at the rate of 4 percent per annum was paid by petitioner in the face of a legal rate of 6 percent prevailing in the State of Pennsylvania. The failure of the trustee to collect the legal rate is not explained in the record. We are unable to find from the evidence of record unconditional transfer of the bonds and unqualified execution and delivery of the note by petitioner to his wife as alleged by him.

The respondent alleges that the whole arrangement was put into effect as a pledge to secure petitioner's wife against loss on account of the money and stock she had at risk in petitioner's stock account. There is evidence to support such view. But other evidence, the terms of the trust, and the acts of the nominal grantor and beneficiary under it, tend to leave the matter in confusion. Petitioner's wife testified as to protection intended for her; but plainly her view is not to be given great weight, for she also testified when asked the purpose of the trust: "I think you had better ask Mr. Livingstone that question, because—I am sorry; the trusts are quite beyond my comprehension"; also, asked whether she considered the $200,000 note as interest or charge for the help she was giving her husband: "It was arranged for, everything, by the Western National Bank, and you will have to ask them those questions, because everything is too complicated for me." Livingstone, too, is inconsistent in his account, for he also refers to protection for the wife, yet is positive that the insurance was not necessary for her protection, because she had the Dentists' Supply Co. stock for her protection. He says also that they could not figure on the bonds as a base of their plan. The bonds under the trust arrangement were obviously no protection for the wife, for the husband could, under the trust, and did on June 1, the day after the trust agreement was signed, authorize all of the bonds to be withdrawn from the trust and pledged to secure a loan for him, he expressing his desire to secure the proceeds of the loan as soon as possible. The entire corpus of the trust was, in the same way, subject to the command of the petitioner. We conclude that a theory of protection of the wife does not explain the reason for the trust.

We do find evidence strongly indicating that the whole plan was conceived and put into effect for the purpose of forming a taxable entity charged with the duty of paying insurance on the life of petitioner. This is shown by the testimony of Livingstone. He testified that the insurance did not result from the wife's loans of stock to petitioner; also that it was decided upon at a time other than when the conclusion was reached to obtain a note from petitioner for $200,-000; and that the wife's loans of stock and cash were adequately protected without the insurance. Other testimony of Livingstone, quoted above, acknowledges inability to give a reason for obtaining the note. Livingstone could not rely upon the bonds as corpus for the trust because they were in the estate of petitioner's father and it was not known at the time the trust was being prepared when they would be distributed, and they were not, in fact, received by petitioner until May 26, the day after the wife had assigned his note to the trustee, and the second day after the insurance was applied for and in large

part issued. It thus appears that if the bonds had not been available for transfer to the trustee the corpus of the trust would have consisted of merely petitioner's note, an income-producing asset, and life insurance, an expense item, with the plain effect of a life insurance carrying trust. That the bonds were in fact added would not change the situation. Petitioner was to receive any income in excess of premiums. Though unable to figure the bonds as base of the plan, the parties did figure the note as the base. Though nothing was ever paid upon the principal of the note, the interest was paid regularly each year, within 30 days of the due date of the interest and the insurance premiums. The effect of the arrangement has been the carrying, by the note, of insurance. Admittedly, the insurance was not necessary to protect against the wife's advances or loans. The remainder of the trust corpus, the bonds, was immediately used by the petitioner, and only a small part is now on deposit with the trustee. The $53,000 has been paid. Yet the note remains in trust, wholly unpaid, producing interest annually at the time when the insurance premiums are due. We conclude and hold that the real object of the trust was to carry insurance on petitioner's life.

In addition, we believe that there was mutual understanding and agreement between husband and wife that the trust, of his note and property, was for his benefit. There was evidence that Livingstone never consulted petitioner in regard to the formation of the trust, but petitioner knew that a trust was under consideration some time before May 24, 1932, on which date he submitted to a medical examination for the insurance policies. There is evidence that he objected to it, but at what stage of the matter is not shown, and it is apparent that the objection was later waived or withdrawn, since on May 24 he joined his wife in signing the insurance applications, executed and delivered to her on May 25 without objection the note which she the same day assigned to the trustee, and thereafter, on May 26, delivered the bonds to her. He had then at least known of the trust for some time. It has not been shown that he did not know the terms under which his wife would place the bonds and note in trust. Asked whether at delivery of the note on May 25 there was understanding as to its being placed in trust, petitioner's answer was not a denial, but only: "Not that I remember." Livingstone consulted petitioner's wife on the terms of the trust and although she testified that the subject was vague to her, nothing of record is opposed to a conclusion that she did have advance knowledge of at least the general terms of the trust, such as that petitioner would have broad powers of control over the property after it had been transferred in trust, and that her control would be of no significance. She testified: "Mr. Livingstone and I had been talking about this trust for some

time." The fact of petitioner's objection and her insistence, and later acquiescence, shows mutual understanding. He was "willing to do anything."

The bankers arranged the trust. There is nothing to indicate that petitioner did not know the terms of the trust when he delivered the note and the bonds, and he acted under it by authorizing withdrawal of the bonds to secure a loan the next day after the trust instrument was signed. In any event, petitioner and his wife were at all times acting through common agents authorized to act for them, and knowledge and acts of the agents were those of the petitioner. Taxpayers who voluntarily authorize others to rearrange their property rights and then comply with requests made upon them as the petitioner and his wife did here, are in no position to assert that they were not aware of the consequences of their acts and in agreement thereon. We think a meeting of the minds of petitioner and his wife has not been negatived. Not only their words but their conduct may, and we think did, prove their understanding that petitioner did not intend to divest himself of control of his property, that the wife knew of, and assented to, petitioner's intent, and that he knew of her assent. *Richardson* v. *Smith, supra.* See also *Johnson* v. *Commissioner, supra.* Livingstone, asked whether he was conversant with the effect of the trust on income tax matters, answered indecisively, but said: "I have—Our lawyer has sort of guided us on that." The respondent determined that the trust corpus belonged to the petitioner and that he was taxable upon trust income. No evidence sufficient to overcome the presumption of correctness of the determination has been adduced. The respondent committed no error in regarding the petitioner as the grantor of the trust. Section 166 therefore applies. As the designated beneficiary of the trust, petitioner (a) was entitled to all of the net income of the trust; (b) could, with the consent of the nominal settlor, require the trustee to distribute to him amounts of principal for his maintenance, support, comfort and enjoyment and any other purpose; (c) could vote and exchange the stock and otherwise exercise rights attached to ownership; (d) exercise power of appointment on the corpus by will; and (e) hypothecate, sell, exchange or loan the property of the trust to any person, firm or corporation he should designate and specify the terms thereof. These powers are sufficient to make the income of the trust taxable to petitioner under section 166. *Percy M. Chandler*, 41 B. T. A. 165. Petitioner's wife had no substantially adverse interest in the corpus or income.

The trustee was directed to use income of the trust to pay insurance on the life of the petitioner. The amount so used is also taxable to petitioner under the provisions of section 167 (a) (3).

## Issue 2.

In his determination of the deficiency for 1935 the respondent taxed the petitioner on all of the income of the four trusts created for the benefit of his children upon the ground that as the settlor of the trusts he reserved the right to direct the trustee as to the use of the income during his life.

The petitioner contends that since no part of the income of the trusts was used for the support and maintenance of his children or in discharge of any of his own obligations, the income of the trusts is not taxable to him. He relies upon *E. E. Black*, 36 B. T. A. 346, and other cases in which it was followed. In the *Black* case and like cases, the discretion to use the income of the trusts for maintenance, support, and education of the settlor's children was vested in the trustee or trustees. Here the petitioner, as settlor, reserved power to receive and apply the income of the trusts for the support, maintenance, education, and enjoyment of his children. Where such a right exists the income of the trust is taxable to the settlor. *J. S. Pyeatt*, 39 B. T. A. 774. Even if the *Pyeatt* case is not applicable, the income of this trust is nevertheless taxable to petitioner. The income of each trust herein was payable "to the Donor, as, if and when ordered in writing by him to do so, during the minority of (his daughter, Virginia Whiteley), to be used solely and entirely by him for her support, maintenance, education and enjoyment." The *Henry A. Loeb* case, 40 B. T. A. 517, holds, following strictly section 167 (a) (2), that if the trust income "may in the discretion of the grantor * * * be distributed to the grantor", then such part thereof shall be included in computing net income of the grantor, regardless of whether any part of the income actually was distributed to the grantor. In fact, in the taxable year, Carl Loeb, Jr., received none of the income and Henry Loeb received $5,000 out of approximately $50,000, the remainder going to their mother and sister.

Since under the language of the instant trust the income "may * * * be distributed to the grantor," is the rule of the *Loeb* case prevented from applying merely because the trustor, if he should receive the income, must use it "solely and entirely * * * for * * * support, maintenance, education and enjoyment" of his minor children, whom he has a duty to support? We think that such restriction, entailing only what would cause grantor's taxability under *Douglas* v. *Willcuts*, 296 U. S. 1, can not logically prevent the application of the rule in the *Loeb* case. Moreover, since the income might be spent for the "enjoyment" of the minors, an element which is beyond the legal obligation of the father and under which it would appear that he might spend the income almost at his will, there is in such respect no essential difference or distinction

from a mere distribution to the grantor. The respondent did not err in taxing the income of the trusts to the petitioner.

Reviewed by the Board.

*Decision will be entered for the respondent.*

MURDOCK and MELLOTT dissent.

---

LEECH, dissenting: This decision must rest, of course, upon the record in this proceeding alone. Since that record does not include any part of the record in any other proceeding, I have grave doubt as to the correctness of the conclusion of the majority on the first issue.

The conclusion on the second issue is, I think, not only wrong but clearly inconsistent with a long line of Board decisions.

The income of the irrevocable trusts was to be paid to the grantor if and when requested by him during the minority of each beneficiary and was thereupon to be used solely for the support, maintenance, education, and enjoyment of the minor beneficiary. However, no part of the trust income was paid to the grantor during the taxable year. Nevertheless, the grantor is held taxable on all of this trust income, under section 167 (a) (2), because he could have obtained and used it to meet his legal obligation to support, maintain, and educate his children. That result requires a linkage of the rationale of *Douglas* v. *Willcuts*, 296 U. S. 1, with the language of the cited section, which, I think, is unjustifiable and barred by that section itself. See dissent in *Dorothy Whitney Elmhirst*, 41 B. T. A. 348, 368.

Moreover, the Board, in a number of cases, including such recent promulgations as *George H. Deuble*, 42 B. T. A. 277, and *Percy M. Chandler*, 41 B. T. A. 165, has refused to apply this rationale in construing that statutory provision where a trustee had the power to distribute such income to the grantor. See *J. Edward Johnston*, 41 B. T. A. 550; *Dorothy Whitney Elmhirst, supra; Arthur Letts, Jr.*, 41 B. T. A. 1172; *E. E. Black*, 36 B. T. A. 346; *Martin F. Tiernan, Trustee*, 37 B. T. A. 1048; *Hudson* v. *Jones*, 22 Fed. Supp. 938. These cases hold that a grantor, in a situation like the present, is taxable only on such trust income as was actually received and used to discharge his legal obligation. The majority attempt to distinguish those cases on the ground that the discretion to distribute the trust income was there vested in a trustee while here it was reposed in the grantor himself. This distinction is clearly untenable. A mere trustee has no interest substantially adverse to that of the grantor, *Reinecke* v. *Smith*, 289 U. S. 172, and, therefore, under the explicit terms of section 167 (a) (2), the possibility of the existence of any such distinction is wholly eliminated. See Randolph E. Paul, "Five years with Douglas *v.* Willcuts,"

53 Harvard Law Review 8, note. Furthermore, this attempted distinction is implicitly rejected in the recent case of *Alfred C. Berolzheimer*, 40 B. T. A. 645. It is true that *J. S. Pyeatt*, 39 B. T. A. 774, is consistent with the result in this proceeding, but it is, I think, wholly inconsistent with the line of cases cited above, and should be overruled on this point.

*Henry A. Loeb*, 40 B. T. A. 517, upon which the majority alternatively rest their conclusion, is obviously distinguishable. In that case the trust income was payable to the grantors, in the discretion of the trustee, without restriction as to its use, and was thus expressly taxable to the grantors under section 167 (a) (2). Here, the use of the income was restricted to that of meeting the legal obligation of the grantor. If that use had been limited to any other than that of paying a legal obligation of the grantor or directly benefiting him, such income, even if paid and so used, would not have been taxable to the grantor. See *Corliss* v. *Bowers*, 281 U. S. 376; *Higgins* v. *Smith*, 308 U. S. 473; *Helvering* v. *Clifford*, 309 U. S. 331; *Burnet* v. *Wells*, 289 U. S. 670; *Commissioner* v. *Morton*, 108 Fed. (2d) 1005. Thus, the only possible basis, constitutionally and otherwise, for taxing the contested trust income to the grantor here, is under section 167 (a) (2) on the ground, implicitly barred by that section itself and inconsistent with decided cases, that he could have secured and used it to meet his legal obligation.

It is argued that the added prescribed use of the income for the "enjoyment" of the beneficiary nullified the effect of any prior limitation and left the income, when received by the grantor, without substantial restriction as to its use.

But, the "enjoyment" had to be the enjoyment of the beneficiary and not the grantor. That those uses are certainly not synonymous contradicts any nullification of the earlier restrictions—particularly here where "enjoyment" is coupled conjunctively with the "support, maintenance, [and] education" of the beneficiary. And if disjunctively construed, "enjoyment" of the beneficiary, since it was no obligation of the grantor, would have relieved the grantor of tax. See *Jay C. Hormel*, 39 B. T. A. 244, reversed on another ground, 111 Fed. (2d) 1.

At all events, I think the restrictions here on the use of the trust income were undoubtedly substantial. Cf. *Mary E. Wenger*, 42 B. T. A. 225. And, since none of this income was received by or used to meet a legal obligation of the grantor, under every decision of the Board of which I know, except *J. S. Pyeatt*, *supra*, it is not taxable to him.

Smith, Van Fossan and Tyson agree with this dissent.