JEROME D. HANSON AND BERNETTA O. HANSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hanson v. Commissioner
Docket No. 4242-80
United States Tax Court
T.C. Memo 1981-675; 1981 Tax Ct. Memo LEXIS 66; 42 T.C.M. (CCH) 1731; T.C.M. (RIA) 81675; November 24, 1981. Donald B. Brown, Barbara J. Rose, for the petitioners. Peter Bakutes, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: * Respondent determined a $ 3,712.50 deficiency in petitioners' 1977 income taxes and a $ 185.63 addition to tax under section 6653(a)[1] for negligence or intentional disregard of rules and regulations. The issues [2] for decision are: (1) whether certain income is taxable to petitioners or to a family estate trust they created, and (2) whether petitioners are liable for an addition to tax for negligence or intentional disregard of rules or regulations under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Jerome D. and Bernetta O. Hanson, husband *69 and wife during the year in issue, resided in Lincoln City, Oregon, when they filed their petition. During all relevant times, Jerome worked as an insurance agent with State Farm Insurance Companies, [3] and Bernetta was an instructor in the night program at Linn-Benton Community College. On or about January 10, 1977, Jerome executed a Declaration of Trust purporting to create the J. D. Hanson Trust (the "Trust"). [4] Jerome purchased the Declaration of Trust, together with other trust forms, introductory materials, and step-by-step instructions for creating and maintaining a family estate trust from the Institute of Individual Religious Studies (the "Institute"). The Declaration of Trust read in part as follows: *70 DECLARATION OF TRUST
TO BE ADMINISTERED BY NATURAL PERSONS, HOLDING TITLE IN JOINT TENANCY, ACTING UNDER THE RELIGIOUS BELIEFS OF THE TRUSTOR AND THEIR INALIENABLE RIGHTS AS CITIZENS OF THE UNITED STATES OF AMERICA
THIS DECLARATION OF TRUST AUTHORIZES ITS TRUSTEES TO OPERATE UNDER THE NAME OF J. D. HANSON TRUST [5]
THIS AGREEMENT, CONVEYANCE, and ACCEPTANCE is made and entered into at the time and on the date appearing in the acknowledgement hereto attached, by and between J. D. HANSON who drafted this irrevocable trust as THE CREATOR HEREOF AND TRUSTOR HERETO and BERNETTA O. HANSON and HAROLD L. FREDERICK [6]
ACCEPTORS hereof in joint tenancy who shall compose The Board of Trustees for conducting said Trust. The Trustor hereby constitutes and appoints the above designated Trustees to be, in fact, Trustees of the Trust hereby created and established. The Trustor for and in consideration of the *71 objects and purposes herein set forth, the cash sum of Ten Dollars in hand paid and other considerations of value the receipt of which is hereby acknowledged, does hereby agree to sell, assign, convey and deliver unto said Trustees, IN TRUST--who are to hold legal title in joint tenancy and not as tenants in common, to collectively act by virtue of this covenant as a Board of Trustees under the name herein designated-certain properties real and/or personal, tangible or intangible, to form the Corpus of this Trust. The Trust name and other things of value to constitute A Trust (Estate), including rights in reversion or remainder wherever situated, and other things of value and having its principle place of business at: 3202 N.E. HWY 101 LINCOLN CITY - ORE. 97367 [7]
The above named Trustees, for themselves and their successors, IN TRUST, do hereby agree to accept properties, real and personal, to be conveyed and acknowledge acceptance of and delivery of all of the property specified, together with all the terms of The Trust herein set forth, agreeing to conserve and improve The Trust, *72 exercising their best judgment and discretion, in accordance with The Trust Minutes, making distributions of portions of the proceeds and income as in their discretion, and according to the minutes, should be made, making complete periodic reports of transactions, and upon final liquidation distributing the assets to be beneficiaries as their interests may appear; and in all other respects administering Said Trust (Estate) in good faith strictly in conformity hereto. Trustees shall be not less than two in number, but may be increased for practical reasons beneficial to The Trust. The Trustees herein mentioned by name or their successors elected to fill vacancies, shall hold office, have and exercise collectively the exclusive management and control of The Trust property and affairs; Trustees may do anything any individual may legally do in any state or county, subject to the restrictions herein noted. They shall continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of THIS TRUST, such as, viz: buy, sell, convey or lease land, including *73 the surface or mineral rights; buy or sell mortgages, securities, bonds, notes, leases of all kinds, contracts or credits of any form, patents, trademarks, or copyrights; buy, sell or conduct mail-order business, or branches thereof; operate stores, shops, factories, warehouses or other trading establishments or places of business of any kind; construct, buy, sell, lease or rent suitable buidings or other places of business; advertise different articles or business projects; borrow money for any business project, pledging The Trust property for the payment thereof; hypothecate assets, property, or both, of The Trust in business projects; own stock in, or entire charters of corporations, or other such properties, companies, or associations as they may deem advantageous. A Minute of Resolutions of The Board of Trustees authorizing what it is they determine to do or have done shall evidence that such an act is within their power. All funds paid into the treasury are and become a part of the CORPUS of THIS TRUST. The Trustees by their resolution of purpose may perform and function for any purpose on behalf of any individual, group or combination of individuals, severally or collectively. *74 In such instances the powers and authority of The Trustees shall be defined and limited to the general purposes set forth by the Declaration of Trust and The Trustees Declaration of Purpose. The Trustees shall regard this instrument as their sufficient guide, supplemented from time to time by their resolutions (said resolution to be ratified ALWAYS by a MAJORITY of the Trustees then in office and participating in the issuing meeting) covering contingencies as they arise and are recorded in the minutes of their meetings, which are the by-laws, rules and regulations of THIS TRUST. The Trust shall have authority to provide itself with operating funds through loans, directly secured by assets or income of THE TRUST, provided such authority is possessed, in writing, from the Board of Trustees of THIS TRUST. The Trustees shall fix and pay compensation of all officers, employees or agents in their discretion, and may pay themselves such reasonable compensation for their services as may be determined by a MAJORITY of the Board of Trustees. The Trustees, officers, agents or employees possess only such authority as awarded them herein. Authority is understood and meant to be similar *75 to that awarded an executor of an estate wherein the testator directs (illustration): "that my Executor is directed to handle the estate in the manner he thinks to be to the best interest, limited by the terms hereof, without the necessity of resort to the court for permission or approval of any transaction, intending herein to leave open for the court the question of conscientious dealing of my Executor only." The declared purpose of the Trustees of this Trust shall be to accept rights, title and interest in and to real and/or personal properties, whether tangible or intangible, conveyed by The Trustor to be the corpus of THIS TRUST, so that J. D. HANSON can maximize his lifetime efforts through the utilization of his Constitutional Rights; for the protection of his family in the pursuit of his happiness through his desire to promote the general welfare, all of which J. D. HANSON feels he will achieve because his RELIGIOUS BELIEFS are sustained by this Trust. * * * * * * [8]
*76 The Trustee shall not be liable for any loss or expense suffered by the Trust estate and arising out of the conduct by the Trustees of any business held by the Trust estate, including any corporation controlled by the Trust, except such loss or expense as shall have been occasioned by the Trustee's gross negligence. Notice is hereby given to all persons, companies or corporations extending credit to, contracting with, or having claims against THIS TRUST, that they must look only to the funds and property of The Trust for payment or for settlement of any debt, tort, damage, judgment or decree, or for any indebtedness which may become payable hereunder. It is expressly declared that a Trust, and not a partnership, is hereby created; and that neither The Trustees, officers, or certificate holders, present or future, have or possess any personal ownership in the property or assets of Said Trust, nor shall they be personally liable hereunder, as partners or otherwise; that no Trustee shall be liable for the act or omission of a Co-Trustee, or any other person, whatsoever, whether employed by such Trust or not, or for anything other than his own, personal breach of Trust. The *77 Beneficial Interests, as a convenience, for distribution are divided into One Hundred (100) Units. They are non-assessable, non-table, non-negotiable, but transferable; and the lawful possessor thereof shall be construed the true and lawful owner thereof. The lawful owner may, if he so desires, cause his Beneficial Certificate to be registered with the Secretary of the Trust. Said Beneficial Certificate entitles the holder thereof to a pro rata share of any distribution of income distributed by the Trustees in their sole discretion, and to a pro rata share of the Trust corpus upon the termination of the Trust. Death, insolvency or bankruptcy of any certificate holder, or the transfer of his certificate by gift, devise or descent, shall not operate as a dissolution of THIS TRUST, or in any manner affect The Trust or its operation or mode of business. Ownership of a beneficial certificate shall not entitle the holder to any legal title in or to The Trust property, nor any undivided interest therein, nor in the management thereof; nor shall the death of a holder entitle his heirs or legal representatives to demand any partition or division of the property of The Trust, nor any *78 special accounting; but said successor may succeed to the same distributional interest upon the surrender of the certificate as held by the deceased for the purpose of reissue to the then lawful holder or owner. Nothing herein contained shall be construed to authorize The Trust to issue Certificates of Beneficial Interest in excess of the number herein provided, nor for a nominal value at variance with the provisions hereof. This Trust is irrevocable and may not be altered or amended in any respect unless specifically authorized by this instrument, and it may not be terminated except through distributions permitted by this instrument. This Trust shall continue for a period of twenty-five years from date, unless the Trustees shall unanimously determine upon an earlier date when they may at their discretion, because of threatened depreciation in values, or other good and sufficient reason necessary to protect or conserve trust assets, liquidate the assets, distribute and close The Trust at any earlier date determined by them. The Trust shall be proportionately and in a pro rata manner distributed to the beneficiaries. In the event this instrument has been recorded, they shall *79 then file with said Recorder a notice that The Trust has terminated and ceased and thereupon, The Trustees shall automatically be discharged hereunder, PROVIDED, their administration and distribution have been made in accordance with the terms and provisions of This Trust Indenture. Otherwise, a court of equity may be invoked to review and correct any tort of error. At the expiration of this Agreement the then Trustees, if they so desire and believe that said Trust should not be closed, may renew this Agreement for a like or shorter period. A resolution of said renewal shall be entered upon the minutes and also recorded in the Recorder's Office (in the event this Agreement has been recorded) at least 120 days prior to the expiration hereof. Public notice shall be made in a county newspaer of general circulation not less than 60 days prior to the expiration hereof. The expressed intent of this instrument is to convey property to Trustees, to constitute a Trust (Estate) for the benefit of the beneficiaries, held by the Trustees, in Trust and in joint tenancy for the duration hereof, and to provide for a prudent and economical administration by natural persons acting in a fiduciary *80 capacity, to BEGIN AT ONCE and not to be deferred until after the death of any creator, settlor or maker, as occurs when such Trust Estates are created by Last Will and Estament. By creating this Legal Entity, The Trustor-Creator of THIS TRUST is exercising his constitutional rights and has done that which is right for himself, thereby demonstrating and implementing his individual Relatious Beliefs. Petitioners established the corpus of the Trust through a series of conveyances designed first to have Bernetta convey her interests in all jointly owned realty [9] and personally to Jerome. In exchange for these transfers, Bernetta was to receive one-half of the Trust's 100 beneficial units. Jerome then conveyed to the Trust all the property which he had previously owned jointly with Bernetta. In exchange for this conveyance Jerome received all 100 beneficial units in the Trust which he immediately caused to be reissued as two 50 unit certificates, one to himself and one to Bernetta. [10] By the end of 1977, the 100 units of beneficial interest in the Trust were owned as follows: Bernetta had 78, Dr. Frederick had 20, Max Hanson and Heather Hanson (petitioners' children) had 1 *81 each. [11]
Each petitioner also executed a document purporting to give the Trust the "right to manage, use, control or profit" from his services. [12] The Trust did not agree to furnish any apparent consideration for petitioners' services, although the documents executed by petitioners state: "I do this for consideration by means *82 of an exchange otherwise set forth in the [Declaration of Trust.]" In addition, Jerome executed documents purporting to lease to the Trust certain property (namely, two cars and a sailboat) in exchange for a "normal maintenance fee." No payment of any kind was ever made by the Trust on these leases. Minutes of meetings of the trustees of the Trust were occasionally drafted on forms provided by the Institute. According to the purported minutes of the second meeting of the trustees dated January 12, 1977, Jerome was unanimously elected a trustee. These minutes further provide that the Trust will bear all Trust-related expenses of the executive trustees (namely, Jerome and Bernetta), that it will provide life and medical insurance for them, and that it will pay them a "reasonable, monthly, consultant's fee." During the taxable year in dispute, petitioners used and enjoyed all the property purportedly conveyed or leased to the Trust just as they had used and enjoyed it before that time. All personal expenses of petitioners were either paid out of a checking account *83 opened in the name of the Trust or were paid by petitioners with funds removed from that account and characterized at year's end as "consulting fees." Petitioners never informed their employers of the purported lifetime services contracts, nor did petitioners ever notify the mortgagee of their residence of any of their transactions with the Trust. Dr. Frederick exercised no control over any aspect of the Trust, and petitioners treated all property purportedly conveyed to the Trust as their own. Because of marital difficulties, Jerome moved out of the family residence in June 1977. Petitioners were divorced in July 1978, and filed with the Lincoln County Circuit Court a "Marital Separation Agreement" which includes provisions for child custody, support payments, and property division. Petitioners' personal effects were divided between Jerome and Bernetta in total disregard of the Trust, and Bernetta was awarded the family residence. [13] In addition, Jerome received "all beneficial right, title and interest in and to the "Trust, and Bernetta resigned as trustee. Bernice Hanson, Jerome's current wife, became a trustee of the Trust shortly after Bernetta resigned. *84 In 1977 petitioners had $ 48,877 of business income, $ 63 of interest income, and $ 2,221.80 of income from Bernetta's teaching activities. [14] In addition, petitioners incurred business expenses of $ 20,436, had a demolition loss of $ 7,032, had itemized deductions of $ 1,070, and made deductible payments of $ 1,304 to a retirement plan. On their 1977 joint return, however, petitioners reported total income of $ 7,221.80, attributable $ 5,000 to consulting fees received from the Trust [15] and $ 2,221.80 from Bernetta's teaching activities. Petitioners deducted Bernetta's income of $ 2,221.80 as income paid to them as nominee for the Trust. Accordingly, petitioners reported an adjusted gross income of $ 5,000 in 1977. *85 In his Notice of Deficiency, respondent determined that all of the above items of income and deduction, which petitioners attributed to the Trust, should be attributed directly to petitioners pursuant to the provisions of sections 61 and 671-678. [16] In addition, respondent determined that petitioners are liable for an addition to tax under section 6653(a). OPINION The first issue to be decided is whether petitioners are taxable on the income attributable to petitioners' services and their income-producing property, or whether the J. D. Hanson Trust (the "Trust"), to which petitioners' purportedly conveyed all of their income-producing property and their lifetime services, is taxable on this income. Petitioners assert that the Trust is a bona fide trust, that the assignment of income doctrine is not applicable, and that the Trust is not a grantor trust under sections 671-678.Respondent, on the other hand, contends that the Trust is a sham, that the Trust is a grantor trust subject to the provisions *86 of sections 671-678, and that petitioners have merely assigned their incomes to the Trust. We agree with respondent. First, respondent maintains that the Trust was a mere paper creature without economic substance which should be disregarded as a sham. Respondent contends that the Trust's status under state law is irrelevant, and that petitioners' complete control and dominion over the Trust's "corpus" demonstrate the sham nature of the trust. [17]
*87 In Markosian v. Commissioner, 73 T.C. 1235 (1980), we dealt with a family estate trust similar to the Trust in this case. There, we relied on the following factors in holding that "there was no economic reality or substance to the transaction which purportedly transferred everything petitioners owned, including * * * future income, to the trust": (1) the relationship of the grantors to the property did not differ in any material aspect before and after the creation of the trust; (2) the grantors were also co-trustees with no person independent of their wishes empowered to prevent them from acting in derogation of the interests of the other beneficiaries; (3) there was no perceived economic interest which passed to the other beneficiaries under the trust arrangement; and (4) the taxpayers did not feel bound by any restriction imposed by the trust itself or by the law of trusts. 73 T.C. at 1243-1244. We concluded by holding that, since "as a matter of economic reality there was no separation of legal title from beneficial enjoyment * * * [the] trust is a *88 nullity under the tax laws." 73 T.C. at 1245. The instant case is no different. Here, petitioners' relationship to the property did not differ in any material aspect before and after the creation of the Trust. Jerome ostensibly created the Trust; however, Bernetta transferred her interest in jointly owned property to Jerome in contemplation of Jerome's actions.Both petitioners subsequently became trustees and exercised full dominion and control over the Trust's assets. No person [18] independent of their wishes was empowered to prevent them from acting in derogation of the purported interests of the other beneficiaries. We can perceive of no economic interest which passed to the beneficiaries (other than petitioners) of the Trust, and all of petitioners' actions with respect to the Trust indicate that they did not feel bound by any restriction imposed by the Trust or by the law of trusts. Here, as in Markosian, petitioners dealt with the trust property free from fiduciary restraints. Accordingly, *89 we find here, as we did in Markosian, that the economic reality is that no trust existed, and petitioners, as the legal and equitable owners of the "corpus," are taxable on any income which that property generated. [19]
Alternatively, respondent contends that the income purportedly earned by the Trust should have been reported by petitioners pursuant to the grantor trust provisions of sections 671-678. The application of these sections was fully explained in Wesenberg v. Commissioner, 69 T.C. 1005 (1978). In brief, if the grantor of a trust retains certain rights or powers, then for income tax purposes he is treated as the "owner" of the portion of the trust over which the rights or powers extend. Sec. 671. Several factors in this case indicate that petitioners [20] retained *90 total control over the Trust. First, none of petitioners' powers as trustee required the consent of an "adverse party." [21] Sec. 672(a); sec. 1.672(c)-1, Income Tax Regs. Second, petitioners had beneficial enjoyment of the Trust's corpus and income. Sec. 674(a). Third, petitioners used the Trust for their own benefit (e.g., the Trust paid for many of petitioners' personal expenses). And finally, the assets of the trust could revert to petitioners at any time. Sec. 673(a). In light of these facts and our decision in Wesenberg, supra, we sustain respondent's alternative position that the income of the trust should be taxed directly to petitioners under sections 671-678. [22]Vercio v. Commissioner, 73 T.C. 1246, 1255-1259 (1980). *91 As a second alternative, respondent asserts that petitioners are taxable on their earned income despite the lifetime services contracts. We agree. Income is taxed to the person who earns it. Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949).Absent an arm's length consideration in exchange therefor, see Achiro v. Commissioner, 77 T.C. No. 62 (October 19, 1981), contractual arrangements that are designed to deflect income away from the one who earns it are not recognized as determinative for federal income tax purposes. Lucas v. Earl, 281 U.S. 111 (1930). Since petitioners have not established that they received adequate consideration in exchange for their lifetime services, they must be taxed on the income created by their services. The second issue is whether petitioners are liable for the addition to tax for negligence or intentional disregard of rules or regulations. Sec. 6653(a). The burden of proof is upon petitioners to show that this addition to tax is inappropriate. Otis v. Commissioner, 73 T.C. 671, 675 (1980); Rule 142(a), Tax Court Rules of Practice and Procedure. We hold that they *92 have filed to carry their burden. Taxpayer faith in a "flagrant tax avoidance scheme" repeatedly rejected by the courts is patently negligent. See Wesenberg v. Commissioner, supra at 1015. While it is true that good faith reliance on advice of counsel or a qualified accountant can, under certain circumstances, be a defense to the section 6653(a) addition to tax, see Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968); cf. Hill. v. Commissioner, 63 T.C. 225, 251 (1974), and while it is also true that we have found that petitioners sought tax advice concerning the Trust, see page 3, supra, there is no evidence that any lawyer or accountant advised petitioners that the Trust would produce the desired tax advantages or in any other way gave advice which resulted in the deficiency. [23] Accordingly, we hold for respondent. Decision will be entered for the respondent. Footnotes
*. This Memorandum Findings of Fact and Opinion was prepared by Judge Hall↩ during her tenure of office. 1. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue. ↩
2. Petitioners in 41 other cases now pending before this Court have agreed to be bound on these two issues by our decision in this case.↩
3. In his capacity as an insurance agent, Jerome was an independent contractor for State Farm, not an employee.↩
4. Jerome first considered the possibility of creating a trust in 1969 after experiencing delays in settling the estates of his father and brother-in-law, but he did not actively pursue the idea until 1976 when a co-worker, Stanley Schmidt ("Schmidt") told Jerome about family estate trusts. Prior to executing the Declaration of Trust, Jerome discussed the potential benefits with Bernetta, a family friend, his personal attorney and Schmidt. Schmidt had set up a family estate trust of his own, and discussed, among other things, the possible tax advantages of such a trust with Jerome.↩
5. This document is a typed form containing blanks for the settlor to fill in. All additions made by Jerome are underscored.↩
6. Harold L. Frederick ("Dr. Frederick") was a family friend of petitioners without prior experience as a trustee or financial advisor.↩
7. This was the address of petitioners' residence (the "Devil's Lake Road" property).↩
8. Omitted are three quotations added (in the space provided) by Jerome which allegedly express his religious sentiments. The quotations were copied by Jerome from a list in the instructional materials provided to "help [the settlor] formulate a statement of his religious beliefs which are sustained by th[e] trust."↩
9. This consisted of petitioner's residence and certain business property used by Jerome in operating his insurance agency. ↩
10. Petitioners did not consider any of the transactions between Bernetta and Jerome, and between Jerome and the Trust to be gifts. Rather, petitioners viewed the transactions between Bernetta and Jerome to be contractual obligations. Petitioners failed to give any adequate explanation for the transactions between Jerome and the Trust, although they did indicate that Jerome received the 100 units of beneficial interest as consideration for his transfers. ↩
11. On January 14, 1977, Jerome caused his certificate of beneficial interest in the Trust to be reissued to Dr. Frederick, Bernetta, Heather Hanson and Max Hanson. Jerome filed no gift tax return reflecting this subsequent distribution of units of beneficial interest.↩
12. The Trust applied for, and received, an Employer Identification Number from the Internal Revenue Service.↩
13. Within three weeks immediately preceding the trial in this case, some confusion over title to petitioners' residence arose. Nevertheless, it is clear that petitioners intended to transfer the family residence to Bernetta as a part of the divorce settlement.↩
14. Neither State Farm Insurance nor Linn-Benton Community College ever paid commissions or salary directly to the Trust. Rather, during the entire 1977 year, petitioners were paid these amounts directly. Jerome, to some extent, transferred his commissions to the Trust. Bernetta, on the other hand, cashed her salary checks and spent that money however she chose. ↩
15. At trial petitioners stated that the correct amount of consulting fees should have been $ 8,000.↩
16. Respondent consistently ignored the Trust in his Notice of Deficiency and so determined that the reported consulting fees should not be included in petitioners' incomes.↩
17. Petitioners counter this argument by pointing out that title to their jointly owned assets was transferred to the Trust, that they created the Trust solely for probate reasons and that federal income tax consequences played no role in their decision to create the Trust. While we agree with respondent that the Trust is a sham for federal tax purposes, we emphasize that this determination does not mean that petitioners' purported probate goals are thwarted. It may very well be the case that, under Oregon state law, upon the death of one of the petitioners the Trust permits the devolvement of his or her property outside probate. This fact does not affect our inquiry into whether the Trust is a sham for federal tax purposes. Moreover, despite Jerome's repeated assertions that his purpose for creating the trust was to facilitate estate planning and avoid unnecessary probate problems, we find as a fact that petitioners' primary, if not sole, purpose for creating the Trust was to take advantage of the federal income tax benefits advertised by the Institute and emphasized by the Institute's representatives such as Schmidt.↩
18. We have disregarded Dr. Frederick as he was a mere nominee of petitioners who did not perform any significant duties or exercise any significant control or power.↩
19. The fact that petitioners divided the trust corpus between themselves as part of their divorce settlement without regard to the interests of the other nominal beneficiaries, is in itself strong proof that petitioners never intended to part with legal or equitable title to their property.↩
20. Petitioners were equal co-grantors. The conveyances from Bernetta to Jerome were not only intended to form part of a single plan to create one trust for all their property but, in fact, they were contractually dependent upon Jerome's subsequent reconveyance to the Trust. The two steps being part and parcel of a unified plan, respondent may treat the two steps as one. See, e.g., Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613 (1938); Gregory v. Helvering, 293 U.S. 465 (1935); Whiteley v. Commissioner, 42 B.T.A. 402 (1940), affd. 120 F.2d 782↩ (3d Cir. 1941). 21. Where it is likely that an income beneficiary will be subservient to the grantor's wishes, as is the case here with Dr. Frederick, that person is not an adverse party. See Vercio v. Commissioner, 73 T.C. 1246, 1258↩ (1980). 22. The Trust is also a grantor trust pursuant to section 675. Petitioners used the corpus of the Trust precisely as they had when they owned it outright, and they paid nothing to the Trust for such use. They thus "directly or indirectly" borrowed the corpus of the trust during the taxable year but paid no interest nor pledged adequate security. Accordingly, section 675(3) applies. And finally, petitioners also fall within the net of section 677(a) to the extent of their proportionate ownership of the units of beneficial interest.↩
23. See A.C. Engineering Corp. v. Commissioner, T.C. Memo. 1958-147↩.